CHESTER W. FANNON, JR., AND MARY T. FANNON, Petitioners, V. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fannon v. Commissioner
Docket No. 33986-84.
United States Tax Court
T.C. Memo 1986-572; 1986 Tax Ct. Memo LEXIS 32; 52 T.C.M. (CCH) 1113; T.C.M. (RIA) 86572; December 2, 1986. Malcolm E. Ritsch, Jr.,James H. Price III and James W. Morris III, for the petitioners. William L. Ringuette, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioners' Federal income tax for taxable years *33 ending December 31, 1979, 1980 and 1981 in the amounts of $29,095.59, $39,811.23, and $27,837.71, respectively. The single issue for decision is: what was the fair market value on December 17, 1979, of a "scenic easement" over certain real estate in Rappahannock County, Virginia, donated by petitioners to the Virginia Outdoors Foundation. Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners are husband and wife whose legal residence at the time of filing the petition herein was Castleton, Virginia. For taxable years 1979, 1980 and 1981, petitioners timely filed joint Federal income tax returns with the Director, Internal Revenue Service Center, Memphis, Tennessee. Petitioners own approximately 333 acres of scenic, rural property located in the Jackson District of Rappahannock County, Virginia. The subject property is located two and one-half miles from Washington, Virginia. Washington, the county seat, is approximately 65 miles southwest of Washington, D.C. The population of Washington, Virginia in 1979 was approximately 200. It grew approximately 30.7 percent between 1970 *34 and 1980 while Rappahannock County grew approximately 17.2 percent during the same years. Most of petitioners' property consists of gently rolling pasture, cropland or woods. Two rivers, the Thornton and Battle Run, pass through the property. Other than petitioners' residence, swimming pool, barn and miscellaneous frame buildings, the property is largely unimproved. There are no sidewalks or curbs, sewage disposal is by an individual on-site septic system, and water is provided by means of drilled wells. Access to petitioners' property is provided by two paved state highways. Virginia state Route 729 is the eastern boundary for much of the property and state Route 618 bysects the property east and west at its midpoint. By a valid deed of easement dated December 17, 1979, petitioners conveyed to the Virginia Outdoors Foundation, an "open-space easement in gross over, and a right in perpetuity to restrict the use of" approximately 308.25 acres [1] of petitioners property (hereafter referred to as the "scenic easement" or "easement"). Virginia Outdoors Foundation is a qualified charitable organization described in section 170(c)(2). [2] The restrictions imposed by the scenic easement *35 on the use of the property include: (1) no dumping of refuse; (2) restrictions on signs and outdoor advertising; (3) with the exception of one 38 acre parcel, no subdivison into parcels less than 50 acres each; (4) only selective culling of timber; (5) restrictions on grading, blasting or earth removal; (6) restrictions on the number and type of structures that may be constructed on each parcel in the event of subdivision; and (7) restrictions on industrial or commercial activities. Conveyance of the scenic easement to the Virginia Outdoors Foundation qualified under section 170(c) as a charitable contribution. On their Federal income tax return for taxable year 1979, petitioners reported the value of the easement as $236,752. Petitioners attached to their 1979 return copies of the deed and an appraisal letter dated December 8, 1979, from Mr. J. Newbill Miller ("Miller"), a local real estate expert. The deduction taken by petitioners on *36 their 1979 return was limited to $56,353 by section 170(b)(1)(C). $79,209.90 was carried over to petitioners' 1980 Federal income tax return and $57,199 was carried over to petitioners' 1981 Federal income tax return. [3]
In his notice of deficiency, respondent valued the scenic easement at zero. Accordingly, respondent disallowed petitioners' charitable contribution deductions based on the easement for taxable years 1979, 1980 and 1981. [4]
The only matter in dispute is the fair market value on December 17, 1979, of the scenic easement donated to the Virginia Outdoors Foundation. To establish the easement's fair market value, petitioners *37 and respondent each presented the testimony of an expert witness. PETITIONERS' EXPERT TESTIMONY Petitioners called Miller as a witness to verify his previous appraisal. Miller has lived most of his life in Rappahannock County, has been a real estate agent for over 20 years, a member of three boards of realtors, and is actively engaged in appraising real estate in Rappahannock and surrounding counties. He is recognized as a real estate expert by the circuit courts of Warren, Madison, Rappahannock and Fauquier Counties of Virginia. Miller has had extensive experience in zoning and land use in Rappahannock County. He served as Chairman of the Rappahannock County Board of Supervisors for 10 years and as a member of the Rappahannock Planning Commission for 20 years. In addition, Miller served for eight years as mayor of Washington, Virginia, and served one term as the District Director of the Soil and Water Conservation Service. In his letter dated December 8, 1979, Miller concluded that the highest and best use of the property before the easement was granted was residential development, but that the scenic easement prevented that use of the property so its highest and best use *38 after the easement was for agricultural use. He used the "before and after" method to value the easement. Easement fair market value was derived by subtracting the agricultural value of the land with the easement ($68,248) from the projected "development value" of the land without the easement ($305,000). [5] He thus opined that the fair market value of the easement was $236,752. In a subsequent report dated October 25, 1985, Miller listed the market data and valuation formulae he used in valuing the scenic easement. At trial, Miller testified the property had unique attributes "that *39 make for successful residential home sites. It has view, it has rolling land, it has trees, it has streams, and it has long road frontage." He consulted "two of the top three realtors in the area" who confirmed the desirability of the property for residential development. Although at the time of contribution the property was zoned for agricultural use, Miller testified that petitioners could have requested the property be rezoned and that the request would have been granted. In so stating, Miller drew upon his experience as Chairman of the Board of Supervisors and member of the Rappahannock Planning Commission at the time the ordinances regarding land use in Rappahannock County were enacted. Although Miller maintained the easement's value was $236,752, at trial he increased his valuation of petitioners' property based on its current use from $305,000 to $336,000. [6]
Miller further testified the 1979 pre-easement value of petitioners' property, fully subdivided, would be $763,000, or $2,500 per acre. [7]Miller derived the *40 $2,500 per acre valuation by comparing petitioners' property, hypothetically developed for residential use, to other developments within Rappahannock County. He relied heavily on sales of residential lots in Peyton Farm, a development 1-1/2 miles west of petitioners' property. Miller testified that residential lots in Peyton Farm sold for $3,000 to $5,000 per acre which, when adjusted to 1979 values, would result in values between $2,500 to $3,400 per acre. Miller then subtracted costs totaling $512,000, which he testified would be incurred to develop the property into residential lots, plus a ten percent "margin of error" from $763,000 to reach a "development profit" of $226,000. Apparently, the Court is to infer that the "development profit" represented the value of the scenic easement because realization of that profit is prohibited by the scenic easement. Petitioners introduced as evidence several outside *41 studies prepared by third parties. None of the studies were cited in Miller's appraisal reports of December 8, 1979, or October 25, 1985. Miller did testify however, that he considered the studies for purposes of his testimony at the trial held November 20, 1985. One such study outlining the property's soil composition was prepared by E. O. Gooch & Associates ("Gooch Study"). Petitioners commissioned the Gooch Study to determine the suitability of the soil for use in construction of septic tank drain fields required for residential development of petitioners' property. In his appraisal report of October 25, 1985, Miller assumed the property could be subdivided into five acre lots. However, in light of the Gooch Study, Miller testified at trial that ten acre lots would be required to provide each lot with suitable soil for septic tank drain fields. Two other soil surveys, Soil Survey of Rappahannock County prepared by the United States Department of Agriculture Soil Conservation Service and a study of Virginia Agricultural use-values co-produced by the Virginia Polytechnic Institute (jointly referred to as the "VPI Study"), were also introduced. Miller testified that the VPI *42 Study showed petitioners' property had greater capacity for septic drain fields than did the Gooch Study. Nevertheless, Miller chose to rely on the Gooch Study for purposes of his testimony at trial. Another third party report was issued by the Commissioner of the Revenue of Rappahannock County ("appraiser") and dated November 15, 1985 ("appraiser's report"). It stated that petitioners' property was assessed in 1982 at $1,000 to $1,200 per acre [8] and was subsequently lowered to $700 per acre "after consideration was given to the scenic easement placed on the property." No other reason was given for the devaluation. At the time of trial, only one sale of property encumbered by a scenic easement was reported to have occurred in Rappahannock County. This sale, recorded as Beattle-to-Favareau, [9] occurred on November 28, 1983. The stated sales price for the 98 acre parcel was $700 per acre. Miller testified the value of the land would have been $1,400 per acre were it *43 not encumbered with the scenic easement. No evidence was offered that the restrictions in the scenic easement on the Beattle property contained provisions similar to those in issue before us. However, respondent did not challenge Miller's use of this property as a comparable either at trial or in his post-trial briefs. He challenged Miller's testimony thereon only with respect to the property's fair market value. With the exception of the Beattle land, petitioners' property was the only property in the general area encumbered by a scenic easement. Miller stated the devaluation of the underlying property caused by a scenic easement is greater in an area where a prospective buyer has numerous properties not encumbered from which to choose. He testified that sales of land encumbered by scenic easements in Fauquier, a county in Virginia where numerous parcels are so encumbered, does not provide reliable information on the value *44 of petitioner's scenic easement. Miller listed additional factors, including the presence of foreign buyers in Fauquier County, which distinguish real estate values in Fauquier from those in Rappahannock. RESPONDENT'S EXPERT TESTIMONY Respondent's expert witness, Mr. John A. Davidson ("Davidson"), is a real estate appraiser with the Internal Revenue Service, Philadelphia District, with a post of duty in Richmond, Virginia. Prior to his employment with the Internal Revenue Service, Davidson was employed by the United States Army Corps of Engineers as Chief Appraiser. He has qualified as an expert in Federal Courts in Newark, New Jersey, the Northern District of Miississippi, and the United States Tax Court. Davidson refers to himself as an "outside appraiser," who he believes is more objective. Although he testified at trial that he sometimes consults local experts in the real estate market under study, he did not do so in this case. Davidson did not go on the property, but instead observed it from the road. [10] He used data in part collected for a previous case before this Court concerning the value of a scenic easement located in Fauquier County. [11]
*45 Davidson also used the "before and after" method to value the easement. In his appraisal report dated November 1, 1985, Davidson valued petitioners' property both before and after the easement at $345,000. He therefore assigned a zero value to the scenic easement donated by petitioners to the Virginia Outdoors Foundation. His 58 page report contained market data and assumptions he used in deriving his before and after value of petitioners' property. Davidson was not aware of the Beattle-to-Favareau transaction. He stated in his report, "This appraiser does not know of any encumbered properties which have resold in Rappahannock County. Therefore, it is necessary to go into competing areas for comparison purposes." Accordingly, Davidson listed ten "resales" of encumbered property located in the adjoining Fauquier and Clarke counties. The data indicated annual appreciation of the subject properties ranging from 4.36 percent to 122.47 percent [12] despite scenic easement restrictions similar to those imposed on petitioners' property. Davidson concluded, "Since no other potential land use approaches *46 the same overall property value, the present use as agricultural is recognized as the highest and best use of the subject property" both before and after imposition of the easement. This assumption formed the foundation of his appraisal. He did not consider residential development of the property feasible due to existing zoning restrictions and what he perceived as local sentiment against such development. It was his opinion that residential development of petitioners' property would face a protracted "sell-out" of five to seven years which would reduce the residential value, if any, of petitioners' property. Neither his report nor his testimony provides data on the value of petitioners' property assuming residential development was its highest and best use. Although Davidson's appraisal report sets forth in detail the zoning restrictions which might frustrate residential development of the property, he testified upon cross examination that he did not consider zoning an impediment to subdivision of the property into residential lots. He also admitted that given a choice between property encumbered by a scenic easement and property without easement, a potential buyer might have *47 financial inducement to buy the property without the scenic easement. ULTIMATE FINDINGS OF FACT
The fair market value on December 17, 1979, of the scenic easement donated by petitioners to the Virginia Outdoors Foundation was $90,956. OPINION There is no dispute in this case that an actual donation was made to a qualified charitable donee under section 170(c). To determine the allowable deduction, however, we must determine the fair market value of the donated property, the scenic easement. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." [13]Section 1.107A-1(c)(2), Income Tax Regs. A recognized method of establishing the fair market value of a scenic easement where no comparable sales are available is to measure the difference between the fair market value of the subject property immediately before the easement was granted and the fair market value of the property *48 after the easement was granted. Any decline in fair market value as a result of the easement represents the fair market value of the easement itself. This "before and after approach" was approved by respondent in Rev. Rul. 73-339, 1973-2 C.B. 68, clarified by Rev. Rul. 76-376, 1976-2 C.B. 53. [14]
Both experts agree the before and after approach should be used to value the scenic easement. They agree the highest and best use of the property after the easement was granted was for agricultural use. However, they disagree over its best use before the easement was granted. Miller concluded *49 residential development was the most profitable use of the property before the easement was imposed. Davidson concluded agricultural use was its highest and best use both before and after the easement was granted. Opinion evidence is admissible on the question of value; however, it must be weighed in light of the demonstrated qualifications of the expert and all other evidence of value. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Barry v. United States,501 F.2d 578 (6th Cir. 1974); Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955), affg. a Memorandum Opinion of this Court; Tripp v. Commissioner,337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), *50 affg. a Memorandum Opinion of this Court. We are not restricted to choose one valuation over the other, but may extract relevant findings from each in drawing our conclusions. See Chiu v. Commissioner,84 T.C. 722 (1985). It is not unusual in valuation cases that two expert appraisers reach significantly different conclusions. However, the reports and testimony of the experts in this case are so dissimilar that it strains the credibility of their testimony. Perhaps both experts were too "result oriented" in this case. This places the Court in the unenviable position of applying its judgment in an area where it has no particular expertise, a process which has been described as "inherently imprecise" at best. Messing v. Commissioner,48 T.C. 502 (1967). See also Symington v. Commissioner, 87 T.C.     (filed Oct. 29, 1986). Davidson valued the property as agricultural use land before the easement at $345,000, or approximately $1,119.22 per acre. This is reasonably close to the price being paid for other properties in the area without easements. However, Davidson believed that agricultural use was the highest and best use of the property *51 both before and after the easement and that the easement did not interfere with that use. He therefore arrived at the same value for the property, $345,000, after the easement. Using the before and after method to value the easement, he valued the easement at zero. On its face, this appears to us to be short sighted. Even if the highest and best use of the land before the easement was for agriculture use, or as a country gentleman's estate, the imposition of the easement was bound to reduce the value somewhat, unless we acknowledge that such use of the land will never change. [15] We believe Davidson relied too much on the fact that residential development had not progressed on a large scale in Rappahannock County when this easement was granted. This ignores the fact, however, that Peyton Farm, about one-half miles from petitioners' property, had been developed and marketed for residential use and that residential development was progressing quite rapidly from Washington, D.C. north and west and toward Rappahannock County. Davidson agreed at the trial that a buyer would probably pay more for the property without the easement than with the easement. We agree with this. But neither *52 Davidson nor respondent gave us any opinion on what the property would be worth as prospective residential development property. We think Davidson lacked a personal understanding of the characteristics of petitioner's property which made it suitable for residential development. This may be due in part to his inability to obtain access to the property for purposes of his appraisal and his decision not to seek the advice or opinion of local experts, which Davidson admitted might have been helpful. Davidson's report failed to reflect transfers of the Beattle property, property similar to petitioners' location in Rappahannock County, both before and after a scenic easement had been granted. The property sold for $700 per acre after the easement, while Miller testified its fair market value before the easement was about $1,400 per acre. We believe Miller possessed a superior knowledge of petitioners' property and local governmental and community attitudes toward real estate development. However, his appraisal report lacked a detailed, analytical approach to valuation of petitioner's property, and we *53 have had difficulty in determining how he arrived at the values reported in his appraisals. Miller's testimony at trial amplified his written report, and we have given weight to this testimony. But in our opinion Miller did not justify such a sharp drop in the value of the property as a result of the scenic easement. Because the property has never been used for residential purposes, petitioners' must show, consistent with their burden of proof, that residential development was the highest and best use of their land and that "there existed a reasonable probability the land would be so used in the reasonably near future." Stanley Works and Subsidiaries v. Commissioner, 87 T.C.     (1986) (slip opinion at p.17). In applying the above standard, we find petitioners carried their burden in establishing residential development to be the property's highest and best use. The following factors influenced our decision: (1) Land used for residential purposes in the general vicinity of petitioners' property has a higher value than agricultural land. The disparity is particularly apparent by comparing assessed values of residential property against those of agricultural property. *54 (2) Land formations found on petitioners' property, such as rolling hills, tree lines and the presence of streams and rivers, could be incorporated into a desirable residential community. (3) Surface and subsurface soils appear adequate to support construction of multiple residences. (4) Soil studies establish the ability of much of petitioners' property to support essential septic tank sewage systems. (5) The property is readily accessible by two paved highways. (6) Although zoned for agricultural use at the time of contribution, we are convinced by Miller's testimony that rezoning of petitioners' property would follow such a request. In light of his long participation in local zoning policy, Miller's testimony was credible and convincing. (7) Population growth patterns around petitioners' property suggest residential development is reasonably probable in the reasonably near future. [16] There was a noticeable movement of small "high tech" and other business out the corridor northwest of Washington, D.C. toward Rappahannock County that attracted residential development in that direction. *55 Having concluded that residential development was the highest and best use of petitioners' property before the easement was granted, we must determine the decrease in value of the property resulting from the scenic easement, which effectively prevented such use. Normally respondent's determination of value would be presumed to be correct and petitioners' would have the burden of proving that respondent's determination of the value of the easement was wrong, but under the circumstances here involved we cannot conclude that respondent has established a presumption of correctness that petitioner must disprove. Presumably in reliance on his determination that residential development was not the highest and best use of the property before the easement was granted, respondent has made no determination of the value of the property for residential development prior to the granting of the easement. Our conclusion that residential development was the pre-easement highest and best use of the property does not place the burden of proof on respondent to prove that value but it does relieve petitioner from the presumptive correctness of respondent's determination of value. Consequently, we *56 must determine that value ourselves, based on all the evidence relative thereto, without the benefit of any presumptions. While most of the evidence of the value of the property for preeasement residential development was presented by petitioners we are not satisfied with petitioners' valuation of the property for that purpose. Miller's first method of valuation, reflected in his appraisal letter of December 8, 1979, was based on an Internal Revenue Service special farm valuation formula for estate tax purposes, based on net rental income, which we do not find to be appropriate here. [17] The second method was based on development of the property into 30 ten acre lots. Petitioners admit residential development requires that the soil be suitable for installation of septic tank sewage systems. Initially, Miller assumed the property could be subdivided into five acre lots. However, after reading several reports on the suitability of soil in the Rappahannock area for sewage purposes he increased the necessary acreage per lot to 10 acres, thus reducing the number of lots. But the Gooch study, upon which Miller relied and which focused specifically on petitioners' property, concluded *57 that approximately one-half of petitioners property, land adjacent to the Beattle Run and Thornton River, is subject to flooding and is not suitable for septic tank drain fields. Miller failed to submit, either in written or graphic form, any evidence indicating how the property could be subdivided into 30 ten acre lots with each lot containing enough soil suitable for septic tank drain fields. Miller's third method of arriving at his conclusion was reliance on the report of the Commission of Revenue of Rappahannock County (assessor herein). That report, while lacking in specific explanations of why the action was taken, states that in 1982 a 161.72 acre tract owned by petitioners was assessed at $1,000 per acre but was later lowered to $700 per acre, a 28.20 acre tract owned by petitioners was assessed at $1,200 per acre which was later reduced to $700 per acre, and a 118.33 acre tract owned by petitioners was assessed at $1,200 per acre but was later reduced to $700 per acre, all "after consideration was given to the scenic easement placed thereon." While we do not normally rely on assessor's *58 values, we have held that assessed value may be considered when the relationship of assessed value and fair market value is demonstrated, but basically as a corroboration of fair market value determined by a more reliable method. Northern Trust Co. v. Commissioner, 87 T.C.     (1986). Since petitioners rely to some extent on this report it was received in evidence to support petitioners' argument that the value of their property was reduced by the easement. This was corroborated by the sale price of the Beattle property after that easement was granted. There is not much dispute that the pre-easement value of the land as it was being used at the time the easement was granted, for agricultural use, was about $330,000 to $335,000 or between $1,000 and $1,200 per acre. While there is no explanation in the assessor's report of how he arrived at the amount of devaluation caused by the easement, his figures are supported by the devaluation of the Beattle property which occurred after an easement was granted. On the whole we find that the assessor's devaluation of the property attributable to the easement was useful as a guideline. However, because we have no evidence of how it *59 was arrived at, (and petitioners who rely on it made no effort to supply such information), and because we feel that the assessor's devaluation represents a rather high percentage of the value before the easement for property for which there was little prospect of immediate development, we cannot accept it as determinative for purposes of this case. Using our own best judgment based on the evidence put before us we conclude that the granting of the scenic easement resulted in a devaluation of petitioners' property to the extent of $200 per acre on the 161.72 acre parcel that had been assessed at $1,000 per acre, and of $400 per acre on the two parcels, 28.20 and 118.33, that had been assessed at $1,200 per acre. Using the "before and after" method we find that the value of the easement was $90,956, calculated as follows: Assessor's
Pre-Easement
Post-Easement
Total Parcel
Acres
Value Per Acre
Value Per Acre
Devaluation
Devaluation
161.72
$1,000 $800 $200 $32,344 28.20 1,200
800
400
11,280
118.33
1,200
800
400
47,332
Total Devaluation
$90,956 [18] Valuation of the easement $90,956 *60 Decision will be entered under Rule 155.
Footnotes
1. Approximately 25 acres of petitioner's property were excluded from the scenic easement. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the taxable years in question.↩
3. Only petitioners' 1979, 1980 and 1981 Federal income tax returns are before this Court.However, if the Court were to allow the full value of the easement as claimed by petitioners, the balance of $43,990.10 could be carried over the claimed as a charitable deduction on petitioners' returns for subsequent years.↩
4. In addition to donation of the scenic easement, petitioners claimed other charitable deductions totaling in the aggregate $4,817 for taxable years 1979, 1980 and 1981. Respondent has not challenged these deductions.↩
5. Because of Miller's trial testimony we believe he incorrectly listed the "development value" of the property as $305,000 in his December 8, 1979 report. He later testified, infra, the value of petitioner's property subdivided for residential development to be $763,000. Although we cannot be certain, we believe Miller's $305,000 figure represented the value of the property as it was then used -- neither fully agricultural, nor fully residential. This use of petitioners' property at the time of the donation of the scenic easement will hereinafter be referred to as the property's "current use."↩
6. The record does not explain why Miller's valuation of the easement is not affected by his increased valuation of petitioners' pre-easement property.↩
7. Miller multiplied 305.25 acres by $2,500/acre ($763,125) and then rounded the result to $763,000. The correct acreage of petitioner's property encumbered by the scenic easement is 308.25 acres. Miller's pre-easement valuation must accordingly be increased to $770.625.↩
8. 161.72 acres was assessed at $1,000 per acre, 146.53 acres at $1,200 per acre, and the remaining property was not considered in the Commissioner's report because it was not subject to the scenic easement.↩
9. Mr. and Mrs. Charlie Swain, sellers in the referenced transaction, were divorced prior to transfer of their property. Upon separation, Mrs. Swain assumed her maiden name, Beattle. Apparently, Ms. Beattle sold the encumbered property to Favareau.↩
10. Petitioners allowed Mr. Rapp, an Internal Revenue Service appraiser, to come onto petitioners' property to complete his appraisal. When completed, respondent refused to release this first report to petitioners. Consequently, petitioners refused to grant Davidson, second Internal Revenue Service appraiser, access to their property. We draw no negative inference from petitioners' refusal to allow a visit by a second appraiser without production of the first report. ↩
11. See Symington v. Commissioner,↩ 87 T.C.     (filed Oct. 29, 1986), which involved the value of a scenic easement in Fauguier County, Virginia, and in which Davidson testified as an expert.
12. Average annual appreciation of the ten properties was 37.17 percent.↩
13. This long accepted definition of "fair market value" is not too appropriate for a scenic easement which is hardly a marketable product. But it is quite an appropriate definition of fair market value of the underlying property before and after a scenic easement has been granted. These values are necessary ingredients in a "before and after" method of valuing a scenic easement.↩
14. See also Akers v. Commissioner,T.C. Memo. 1984-490, affd. 799 F.2d 243 (6th Cir. 1986); Thayer v. Commissioner,T.C. Memo. 1977-370↩.
15. See Symington v. Commissioner,↩ 87 T.C.     (filed Oct. 29, 1986).
16. We need not determine that extensive residential development of Rappahannock County is imminent or even a "few years down the road." Our inquiry is centered on petitioners' property and the probability of its development, were it not encumbered by the scenic easement, in the reasonably near future.↩
17. Furthermore, we find no support for the figures used in applying the formula.↩
18. We again voice our concern over the time and resources spent by this Court in resolving valuation disputes and repeat our admonition that such cases should be disposed of short of Court proceedings. See Symington v. Commissioner,↩ 87 T.C.     (filed Oct. 29, 1986). Our experience has indicated that seldom do the parties get their experts together before trial to discuss their differences.