**Elinor P. McLENNAN, Individually and as Executrix of the Estate of Donald R. McLennan, Jr., Deceased, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 129–87T.**

United States Claims Court.

Sept. 10, 1991.

Michael J. Lynch, Pittsburgh, Pa., attorney of record, for plaintiff; Kirkpatrick & Lockhart, of counsel.

Terry T. Coles, Washington, D.C., with whom was Asst. Atty. Gen. Shirley D. Peterson, for defendant; Mildred L. Seidman, and Grissim Walker, of counsel.

## OPINION

FUTEY, Judge.

This tax case is before the court after a trial on the merits. Plaintiff seeks a refund of $325,438.59 in federal income taxes paid in the 1980 and 1981 taxable years, for the contribution of a scenic easement to the Western Pennsylvania Conservancy (Conservancy). Defendant maintains that plaintiff's transfer of the scenic easement was not a charitable contribution under § 170 of the Internal Revenue Code of the 1954 (Code),[1] 26 U.S.C. § 170, and alternatively, that plaintiff was entitled to a $70,000.00 deduction for the charitable donation.

### Factual Background

The facts underlying the present controversy are not in dispute. Plaintiff, Elinor P. McLennan, filed a joint U.S. Individual Income Tax Return (Form 1040) with her

---

1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in 1980.

now deceased husband, Donald R. McLennan, Jr., for the taxable years 1980 and 1981.[2] During the period in question, the McLennans owned a 406.597 acre residence in Ligonier and Cook Townships, Westmoreland County, Pennsylvania. The property is located on both the east and west side of Pennsylvania State Route 711 (PA 711).

The Conservancy is a non-profit corporation organized under the laws of the Commonwealth of Pennsylvania. The Internal Revenue Service (IRS) has recognized the Conservancy as a tax exempt organization within the meaning of 26 U.S.C. § 501(c)(3) and a corporation as defined in 26 U.S.C. § 170(c)(2) since 1951. The Conservancy is devoted to the preservation of natural ecosystems through land acquisition projects known as "conservation programs." One such program, known as the "greenbelt corridor," was designed to preserve the scenic integrity of Ligonier Valley by securing conservation easements in PA 711 property frontage.

In April 1979, the Conservancy requested the McLennans to impose a scenic easement over a portion of their property.[3] The Conservancy promised no compensation for the easement conveyance. However, the Conservancy did explain to the McLennans that the scenic easement transfer might qualify as a charitable contribution. On November 10, 1980, the McLennans executed an "Easement in Gross and Restrictive Covenants," granting the Conservancy a scenic easement over 169.542 acres of their Westmoreland County property. The easement agreement imposed, *inter alia*, restrictions on the following activities:

1. industrial or commercial activity;

2. the placement of mobile homes, camping accommodations, fences, signs, or advertising materials on the property;

3. the construction of roads or erection of utility lines (except those necessary for residential purposes);

4. the removal of top soil, sand, gravel, rocks, or minerals; and

5. filling, excavating, dredging, mining the property (except certain methods of deep coal mining), and drilling (except for oil and gas).

Plaintiff retained the following rights in the easement property:

1. the right to subdivide the easement property into eight parcels;

2. an unrestricted right to build four new family residences and roads to these residences;

3. the right to cut timber to accommodate the residential structures; and

4. the right to farm portions of the property.

In addition, the easement grant provides for the failure of the scenic easement upon condemnation of the underlying property. Any compensation for a taking action is payable exclusively to plaintiff.

In their 1980 Joint Tax Return, the McLennans claimed a charitable deduction of $206,900.00 for the scenic easement contribution. Unable to utilize the full amount of their charitable contribution deduction in 1980, the McLennans carried over and claimed a $223,700.00 deduction in their 1981 Joint Tax Return.

In 1982, IRS agent Robert Berlin performed an audit of the McLennans' 1980 and 1981 joint tax returns. By letter of November 7, 1983, the Commissioner of Internal Revenue disallowed all but $70,000.00 of the charitable deduction claimed by the McLennans. On November 16, 1983, the Commissioner assessed a tax deficiency of $95,830.00, plus $43,626.49 in interest, for the 1980 tax year, and a deficiency of $143,039.00, plus $42,943.10 in

---

**2.** Plaintiff brings this tax refund suit individually and as executrix of the estate of her late husband.

**3.** According to John Oliver, president and chief executive officer of the Conservancy, the

McLennans' property was the "keystone of the Ligonier Valley program." Transcript (tr.) 22–24, 29–30; *see also* tr. 40, 104, 106–07.

interest, for the 1981 tax year. The McLennans paid this amount in full on January 3, 1984. Thereafter, the McLennans filed two amended U.S. Individual Tax Returns for taxable years in question.

Plaintiff instituted an action in this court on March 11, 1987. Defendant amended its answer to plaintiff's complaint on October 21, 1988, alleging that plaintiff was not entitled to the 1980 and 1981 "farm loss" deductions under 26 U.S.C. § 183. Defendant further contended that any tax refund due plaintiff must be offset by the increased tax liability resulting from the disallowance of the farm deductions. Defendant also challenged plaintiff's entitlement to a charitable deduction for the transfer of the scenic easement to the Conservancy. By Opinion of May 6, 1991, 23 Cl.Ct. 99, the court granted partial summary judgment in favor of plaintiff, concluding that: (1) absent an IRS position to the contrary, the Conservancy is a charitable organization within the meaning of 26 U.S.C. § 170(c)(2);[4] (2) plaintiff transferred a sufficient easement interest in the property for purposes of 26 U.S.C. § 170; and (3) defendant failed to produce "positive and concrete" evidence in support of its offset defense. In addition, the court determined that the issue of whether plaintiff lacked the requisite donative intent and an exclusive conservation purpose in conveying the scenic easement to the Conservancy was inappropriate for summary judgment. On May 20–24, 1991, the court conducted a trial on the merits concerning: (1) the donative intent/exclusive conservation purpose

issue; and (2) the fair market value of the scenic easement.

### Jurisdiction

Plaintiff seeks recovery for an alleged overpayment in federal income taxes. As such, the court has jurisdiction over the instant suit under the Tucker Act, 28 U.S.C. § 1491 (1982); 26 U.S.C. § 7422 (1982). *See Consolidated Edison Co. v. United States*, 133 Ct.Cl. 376, 135 F.Supp. 881 (1955), *cert. denied*, 351 U.S. 909, 76 S.Ct. 694, 100 L.Ed. 1444 (1956), *reh'g denied*, 352 U.S. 1019, 77 S.Ct. 552, 1 L.Ed.2d 562 (1957), *reh'g denied*, 364 U.S. 898, 81 S.Ct. 218, 5 L.Ed.2d 192 (1960).

### Discussion

#### A. Donative Intent

Defendant contends that the McLennans cannot claim a tax deduction for granting the scenic easement to the Conservancy because they lacked donative intent and an exclusive conservation purpose at the time of transfer. More specifically, defendant argues that the McLennans participated in the scenic easement program to maintain their property values and to receive a tax deduction. In support of this position, defendant has provided the court with correspondence sent to the McLennans by Thomas Schmidt, vice-president of the Conservancy, which recited the estimated tax advantages of a scenic easement conveyance.[5] According to defendant, plaintiff also lacked donative intent because she sought reconveyance of the easement following IRS disallowance of a significant portion of the charitable contribution.[6]

---

4. Defendant filed a motion for reconsideration of this issue on May 14, 1991, maintaining that this court has jurisdiction to consider its challenge to the Conservancy's charitable status. However, all cases cited by defendant in support of its position involved an Internal Revenue Service (IRS) determination, either in the form of a ruling or litigation position, that the organization in question was not a charitable concern. In the present case, the IRS has made no such determination. The court, therefore, refuses to choose between inconsistent positions of the IRS and the tax division of the Department of Justice.

Assuming *arguendo* that review of this issue is proper in the Claims Court, the court is unconvinced that the Conservancy ceased to function as a charity when it agreed to pay for plaintiff's expert witness in this litigation. In other words, the court is of the opinion that none of the purported activities cited by the Conservancy constitute private inurement. In addition, the court fails to comprehend how a "private inurement" committed in 1991 can retroactively invalidate the Conservancy's charitable status.

5. Defendant's exhibit (D. ex.) 29.

6. Defendant's post trial brief, pp. 19–20.

■ In general, the Code permits deductions for *bona fide* gifts notwithstanding the motivations of a taxpayer. *Sheppard v. United States*, 176 Ct.Cl. 244, 361 F.2d 972 (1966). In order to be entitled to a tax deduction, the taxpayer must not expect a substantial benefit as a *quid pro quo* for the contribution. However, the charitable nature of a contribution is not vitiated by receipt of a benefit incidental to a greater public benefit. *Collman v. Commissioner*, 511 F.2d 1263 (9th Cir.1975). Courts have "customarily examined the external features of the transaction in question" in determining whether a taxpayer made a contribution with the requisite donative intent. *Hernandez v. Commissioner*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989).

■ The McLennans moved to Ligonier Valley largely because the area contained considerable scenic beauty. The McLennans purchased the property for residential and agricultural purposes and did not contemplate subdivision of the land for development. The McLennans were clearly concerned about preserving their land and surrounding acreage from residential development.[7] Further, the McLennans knew their property was an important part of the Conservancy's "greenbelt corridor" and that their decision to donate the easement would invariably encourage other neighboring landowners to impose similar development restrictions on their property. The McLennans also believed that the imposition of a conservation easement would decrease the value of their property. Their decision to donate the easement was, therefore, not an easy one. Concerned about the effect of an easement on their property values, the McLennans performed two appraisals in order to estimate the resulting diminution in value of their land.

Defendant places much emphasis on these appraisals and the letters from the Conservancy which describe the scenic easement program as a tax deductible means of preserving the aesthetic integrity of Ligonier Valley. However, the court is unpersuaded that the McLennans expected a commensurate financial benefit for the scenic easement transfer. As prudent landowners, the McLennans endeavored to determine the ramifications of the scenic easement imposition. The McLennans concluded that an easement over land containing road frontage would diminish substantially the overall value of their property. Although the McLennans knew that the transfer might constitute an allowable charitable deduction, the court notes that Mr. Carona, plaintiff's former accountant, testified that the McLennans did not inquire into the tax consequences of the conveyance until after the decision to transfer the scenic easement was made. In short, the McLennans recognized that the Conservancy was not a tax planner or an expert in scenic easement valuation, but a charitable concern using every means available to market the "greenbelt corridor" to plaintiff and her neighbors. This runs counter to defendant's contention that the McLennans were motivated by tax concerns in granting the scenic easement to the Conservancy. The record does, therefore, not support a finding that the McLennans were primarily motivated by, and relied on, assurances by the Conservancy that the transfer would engender a tax savings while maintaining property values.[8]

■ Mrs. McLennan testified that she and her husband granted the easement to assist the Conservancy in the preservation of Ligonier Valley. Her testimony was corroborated by Messrs. Schmidt, Carona,

---

7. The court also notes that the McLennans had a longstanding interest in land conservation as evidenced by Mrs. McLennan's position as the Director of the Huron Mountain Wildlife Foundation, a charitable concern devoted to natural preservation. *See, e.g.* tr. 111, 124–25.

8. In addition, the court has noted in a previous Opinion that a donation of property for the exclusive purpose of receiving a tax deduction does not vitiate the charitable nature of the contribution. *McLennan v. United States*, 23 Cl.Ct. 99, 105 (1991), *citing Sheppard v. United States*, 176 Ct.Cl. 244, 361 F.2d 972 (1966).

and Anderson, each of whom had contemporaneous conversations with the McLennans on the subject and opined that plaintiff transferred the easement to ensure the aesthetic integrity of the area. This testimony, taken in light of the extrinsic evidence, leads the court to conclude that the McLennans granted the easement to help ensure the pristine quality of their locality. Any benefit which inured to plaintiff from the conveyance was merely incidental to an important, public spirited, charitable purpose.[9] In short, the court finds that the McLennans conveyed the scenic easement to the Conservancy with the requisite donative intent.

### B. *Conservation Purpose*

■ In addition, plaintiff must have transferred the scenic easement for an exclusive conservation purpose to obtain the benefit of a charitable deduction. Section 170(f)(3)(C) provides the following definition of "conservation purpose":

> (C) Conservation purposes defined. For purposes of subparagraph (B), the term "conservation purposes" means—
> (i) preservation of land areas for public outdoor recreation or education, or scenic enjoyment;
> (ii) the preservation of historically important land areas or structures; or
> (iii) the protection of natural or environmental systems.

Plaintiff transferred the scenic easement to the Conservancy to preserve the scenic quality of the subject property. The easement instrument conveyed by plaintiff grants the Conservancy the right to "enforce by proceedings at law or in equity the covenants [of the instrument], including, but not limited to, the right to require the

restoration of the Protected Property to its condition at the time of the grant...." The easement also grants the Conservancy "[t]he right to enter the protective property at all reasonable times for the purpose of inspecting the Protected Property to determine if the Grantors are complying with the covenants and the purposes of this grant." In addition, the instrument gives the Conservancy the right "to plant trees, shrubs, and grasses, or place fences in the easement area in order to enhance and preserve what, in the reasonable judgment of the Grantee, is the best scenic quality of the Protected Property." Further, plaintiff conveyed the easement to a charitable organization whose principal purpose is to preserve and protect land which has scenic and aesthetic value.[10] In addition, the Conservancy has acquired and transferred numerous tracts of land to the Commonwealth of Pennsylvania for state parks, game lands, and natural preserves.[11] The Conservancy acquired plaintiff's scenic easement in furtherance of established preservation goals. The Court, therefore, determines that the scenic easement conveyance served an exclusive conservation purpose.

Accordingly, plaintiff transferred the scenic easement to the Conservancy with donative intent and an exclusive conservation purpose. Plaintiff is, therefore, entitled to a charitable contribution deduction under 26 U.S.C. § 170 equal to the fair market value of the easement on November 10, 1980, the date of transfer.

### C. *Valuation of the Scenic Easement Contribution*

■ The Treasury Regulations (Treas. Regs.) define fair market value as "the

---

9. Defendant also contends that the McLennans lacked donative intent because Mrs. McLennan subsequently inquired into whether the Conservancy would reconvey the scenic easement following a district court decision which disallowed a substantial portion of a neighboring landowners charitable contribution deduction for the conveyance of a scenic easement to the Conservancy. *See Todd v. United States,* 617 F.Supp. 253 (W.D.Pa.1985). Since donative intent need only exist at the time of the transfer, the court places little weight in events transpir-

ing subsequent to the easement conveyance. *Mason v. United States,* 513 F.2d 25, 28 (7th Cir.1975). In any event, the court finds convincing Mrs. McLennan's testimony that the inquiry stemmed from frustration and anger at the IRS for what she interpreted to be a challenge to her veracity. Tr. 430–31.

10. Tr. 59–60; *see also* Schmidt affidavit ¶ 2.

11. *Id.* at ¶ 3.

price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas. Regs. § 1.107A–1(c)(2). The fair market value of a scenic easement is the difference between the fair market value of the property at its "highest and best use" immediately prior to the imposition of the easement and immediately subsequent to the easement grant. *Fannon v. Commissioner*, 52 T.C.M. 1113 (1986), *modified on other grounds*, 842 F.2d 1290 (4th Cir.1988). Both parties agree that the "before and after" approach applies to the valuation of the scenic easement.

The "highest and best use" of property is defined as:

A reasonable and probable use that supports the highest present value as defined as of the effective date of appraisal.

Alternatively, that use from among reasonably probable and legal alternative uses found to be physically possible, appropriately supported, financially feasible, and which results in highest land value.

*Real Estate Appraisal Terminology*, (Rev. Ed.), pp. 126–27.

At trial, both experts agreed that the imposition of the scenic easement resulted in some diminution in value of the McLennan property. In addition, both experts determined that the "highest and best use" of a portion of the property was residential subdivision.[12] However, each expert reached a considerably different conclusion on the value of the scenic easement.

### 1. Expert Testimony

Mr. Reynolds, plaintiff's expert appraiser, divided the McLennan property into nine parcels. Mr. Reynolds determined that the "highest and best" pre-easement use of the property was residential subdivision consisting of 6–acre parcels. Referring to comparable sales in the area of the subject property, Mr. Reynolds estimated the fair market value of these parcels prior to the imposition of the easement to be $1,689,736.00, or $4,156.00 per acre.[13] Separating the eased portion of the property from the non-eased portion, Mr. Reynolds determined the value of the former portion (169.542 of 406.597 acres) immediately prior to the easement to be $1,017,252.00, or $6,000.00 per acre.[14] It, therefore, follows that the pre-easement value of the remaining land was $672,484.00, or $2,837.00 per acre.

Mr. Reynolds next determined that the subdivision/building restrictions on the eased property transformed the "highest and best use" of the property to a residential subdivision of eight lots and dwellings. According to Mr. Reynolds, this resulted in a diminution in value of the eased property of $415,378.00, or approximately $2,450.00 per acre. The fair market value of the eased property as affected by the easement was, therefore, $601,874.00, or $3,550.00 per acre. Mr. Reynolds then opined that easement restrictions not considered previously (i.e. restrictions on soil removal, mining, drilling, etc.) reduced the value of the property by an additional $30,-610.00 ($180.55 per acre). With respect to the non-eased portion (237.055 of 406.597 acres) of the McLennan property, Mr. Reynolds ascertained that the post-ease-

---

**12.** D. ex. 47, p. 120; plaintiff's exhibit (p. ex.) 49, pp. 12–14; *see also* tr. 214, 216, 220–21.

**13.** In his report, plaintiff's expert states:
Eleven comparable sales support the appraisal conclusions. Seven of the subject properties and seven of the comparables are located in Ligonier Township; four of the comparable sales and two of the subject properties are located in adjacent Cook Township.
\* \* \* \* \* \*
The eleven comparable sales were selected because they are nearest in point of distance

and point of time. All are located within one crow-fly mile from the McLennan land, and nine occurred within eighteen months of the effective appraisal date.
P. ex. 49, p. 8.

**14.** In determining pre-easement value, Mr. Reynolds estimated development costs of the lots at 33 percent of the gross sales price. Tr. 282–84, 381–83.

ment value was reduced by one percent, or $6,830.00 ($28.81 per acre).[15] He, therefore, concluded that the total post-easement diminution in value of the McLennan property was $452,818.00.[16]

Ms. Qualters, defendant's expert, valued the McLennan property both before and after the imposition of the easement, at $1,486,000.00. Ms. Qualters considered the property as two economic units for valuation purposes; unit I was the 83.7 acre "residence/show farm" and unit II was comprised of 322.1 acres of agricultural land. Ms. Qualters determined the "highest and best" pre-easement use of unit I was as a country estate. In addition, she testified that the "highest and best use" of unit II was bulk subdivision into five parcels ranging from 29 to 102 acres. Since the easement did not interfere with the "highest and best use" of units I and II, Ms. Qualters reached the preliminary conclusion that the easement did not affect the fair market value of the property. However, Ms. Qualters recognized that "one would reasonably expect some diminution in value as a consequence" of the easement imposition. She testified that the market indicators relied upon would not detect a change in property value of less than 5 percent. Ms. Qualters, therefore, estimates that a 3 to 4 percent change in value resulted from the grant of the scenic easement. Defendant's expert thus concludes that the total diminution in property value is "approximately $50,000.00." [17]

2. Highest and Best Use

    Each expert posited a "highest and best use" of the property which was consistent with applicable zoning restrictions. The McLennan property within Ligonier Township located along the east side of PA 711 is zoned RA, which permits single family dwellings on 3-acre lots. The other Ligonier Township property along the west side of PA 711 is zoned R-2 and permits one-acre single family subdivision. The McLennan property within Cook Township is not subject to zoning restrictions. As such, the subject property could be legally subdivided into parcels 6 acres or larger.

The court must, therefore, determine the reasonable and probable use of the subject property before and after the imposition of the scenic easement. In so doing, the court is not restricted to "choosing one valuation over the other, but may extract relevant findings from each in drawing ... conclusions." *Fannon,* 52 T.C.M. at 1134, *citing Chiu v. Commissioner,* 84 T.C. 722 (1985). Mr. Reynolds opined that the entire McLennan property had a pre-easement "highest and best use" as a 6-acre residential subdivision. Both Mr. Reynolds and Ms. Qualters testified that there were 12 residential subdivisions in Ligonier County at the time of the easement conveyance. However, the record indicates that demand for 6-acre lots was not overwhelming, and it is questionable whether the market could absorb 27 parcels within the time frame necessary to make development lucrative.[18] Mr. Reynolds also related that the residents of the area were generally opposed to subdivision. Furthermore, both experts agreed that large "estate" residences and "estate/farms" were predominant in Ligonier Valley. This leads to the conclusion that there was a stronger demand for estate-type property than for 6-acre tracts in 1980.

Furthermore, Mr. Reynolds' "highest and best use" subdivision scheme contemplates the development of all frontage property into 6-acre residences. Such a subdivision plan would involve the development of the lot containing the McLennan country estate, as well as the placement of homes on lots adjacent to and contiguous from the estate house. "Highest and best use" refers to the most profitable and

---

15. Mr. Reynolds found that the value of the improvements on the property remain unchanged by the imposition of the easement. Tr. 316–21.

16. In his report, Mr. Reynolds rounded this figure to $452,500.00.

17. D. ex. 44, pp. 136–37.

18. D. ex. 47, pp. 77–79.

*probable* use. *Yaist v. United States,* 17 Cl.Ct. 246, 258 (1989). Mrs. McLennan testified that she and her husband opposed development and granted the scenic easement to help preserve the scenic integrity of the Ligonier Valley area. Given the McLennans' strong aversion to development, the court finds Mr. Reynolds' assumption that plaintiff would reasonably and probably use her entire frontage property for residential subdivision untenable. Such a conclusion directly contradicts plaintiff's clear intention to preserve their land from development. Rather, the court is convinced that the reasonable and probable use for the property closest to the McLennan estate compound, both before and after the easement grant, was an undivided country estate.[19] These tracts include those parcels designated by plaintiff as F, G, H, and I.[20] The scenic easement limited subdivision of the subject property but did not affect the "highest and best use" of the land.[21] Since the "highest and best use" remained unchanged, there was no measurable diminution in the fair market value of parcels F, G, H, and I of the McLennan property after the grant of the scenic easement.

The remaining McLennan property, designated by plaintiff as parcels A, B, C, and D/E, is situated on the west side of PA 711 and does not border parcels F through I. The property was used primarily for agricultural purposes and contained significant road frontage.[22] These parcels were a sufficient distance from the McLennan estate to be considered for subdivision. In addition, historical data submitted by the par-

ties indicates that twelve or thirteen 6–acre tracts would be more readily absorbed by the market than 27 tracts and, hence, more profitable for development. The court, therefore, finds that the "highest and best use" for parcels A, B, C, and D/E prior to the imposition of the easement was residential subdivision into 6–acre tracts.

Both experts agreed that the "highest and best use" of the McLennan property after the easement grant was bulk subdivision. Such a conclusion is consistent with terms of the easement agreement, which restricts building/subdivision on the McLennan property to no more than eight lots. The court, therefore, finds that the post-easement "highest and best use" of the McLennan property was bulk subdivision.

### 3. Calculation of Diminution in Value

Since defendant's expert concluded that the pre-easement "highest and best use" of parcels A, B, C, and D/E was bulk subdivision, her calculation of diminution in value is unreliable. Although the court finds merit in plaintiff's expert's calculation of the pre-easement value of the subject property, the court considers his conclusion regarding the post-easement diminution in value to be incorrect since the expert opined that the "highest and best use" of the entire McLennan property prior to the easement grant was 6–acre residential subdivision. The court recognizes, however, that Mr. Reynolds calculated the diminution in value for the eased portions of McLennan property on an average dollar

---

**19.** Plaintiff's expert defined a "country estate" to be "an expensive house in a rural setting with some land around it that is more than a small patch of land." Tr. 386.

**20.** The McLennan estate house was built on the rear portion of parcel H. Parcel H is an 83.738 acre tract. Parcels G and I are immediately adjacent to parcel H and measure 22.003 and 7.750 acres, respectively. Parcel F is an 36.387 acre tract which sits diagonally across PA 711 from parcel H. Parcels F lies on the opposite side of PA 711 from parcel G but is part of the same lot. *See* Appendix (App.) A.

**21.** In *Todd,* the district court reached a similar conclusion, stating:

> Considering that the area around the Todd property consists of estate type property, that there existed a strong demand for such estate-type property in 1979–1980, that the residents of the area historically have been opposed to development, and that at most three subdivisions exist in all of Ligonier Township, it must be concluded that the "highest and best use" of the Todd property, both before and after the grant of the easement, is as a country estate.
>
> 617 F.Supp. at 257.

**22.** Parcels A and B abut PA 711, while parcels D/E front a township road. *See* App. A.

per acre basis. In addition, Mr. Reynolds determined that the non-eased McLennan property experienced a one percent reduction in value. Plaintiff's expert, therefore, did not assign any one parcel of property a higher *per acre* diminution in value than another parcel. The court can, therefore, calculate the diminution in value of parcels A, B, C, and D/E of the McLennan property utilizing the average per acre decrease in land value as determined by plaintiff's expert.[23]

Mr. Reynolds opined that the reduction in value of the McLennan property subject to the easement and attributable to subdivision restrictions imposed by the easement was $2,448.00 per acre. Mr. Reynolds also testified that the additional restrictions imposed by the easement on the property resulted in $180.55 per acre decrease in value ($30,610.00/169.542 acres). With respect to the noneased property, Mr. Reynolds assigned a $28.81 per acre or one percent diminution in value. Parcels A, B, C, and D/E contain a total of 83.033 acres encumbered by the scenic easement and 173.686 acres of property not affected by the easement. Therefore, the total diminution in value of the eased portions of parcels A, B, C, and D/E equals:

A. Acreage Encumbered by Scenic Easement

| | |
|---|---|
| 83.033 acres × $2,448.00/acre | = $203,264.78 |
| 83.033 acres × $180.55/acre | = 14,991.61 |
| Diminution in value: | $218,256.39 |

B. Acreage not Encumbered by Scenic Easement

| | |
|---|---|
| 173.686 acres × $28.81 | = $ 5,003.89 |
| Diminution in value: | $ 5,003.89 |

C. Total diminution in value of parcels A, B, C, and D/E

| | |
|---|---|
| $218,256.39 + $5,003.89 | = $233,260.28 |

Accordingly, the fair market value of the scenic easement, as measured by the difference between the fair market value of the property at its "highest and best use" before and after the easement grant, was $223,260.28. Plaintiff was, therefore, entitled to a $223,260.28 charitable deduction for granting the scenic easement to the Conservancy. Since the IRS disallowed all but $70,000.00 of the charitable contribution deduction, plaintiff is entitled to a tax refund of $153,260.28 for overpayment of taxes in 1980 and 1981.

## Conclusion

For the foregoing reasons, the court finds that plaintiff is entitled to a tax refund in the amount of $153,260.28 and statutory interest as calculated under 26 U.S.C. § 6651(a) and (b). The Clerk is directed to enter judgment in favor of plaintiff in this amount. No costs.

---

23. The court finds the method of appraisal used by Mr. Reynolds to be entirely consistent with Rev.Rul. 76–376, 1976 Cum.Bull. 53, and Rev. Rul. 73–339, 1973–2 Cum.Bull. 68.