T.C. Memo. 2015-88

UNITED STATES TAX COURT

BOB R. DAVIS AND ERIN DAVIS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22729-10.                    Filed May 6, 2015.

<u>Marcus J. Brooks</u>, <u>Steven Gregory White</u>, and <u>Joe A. Rivera</u>, for petitioners.

<u>Stephanie J. Rakoski</u>, and <u>Adam L. Flick</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  Petitioners petitioned the Court to redetermine respondent's

determination of deficiencies of $65,671, $91,514, and $53,130 in their Federal

income tax for 2005 through 2007 (subject years), respectively.  The deficiencies

stem from petitioners' charitable contribution deduction of $2.1 million for 2005

on a bargain sale of 63.39 acres of undeveloped land (subject land) and their

[*2] allocation and carryover of deductions of $566,960, $416,390, and $170,981 for 2005, 2006, and 2007, respectively.[1] The issue is whether the sale of the subject land entitled petitioners to deduct the reported charitable contributions. The Court holds that it did, subject to the limitations stated herein.

FINDINGS OF FACT

I. Preliminaries

The parties stipulated certain facts and exhibits. The Court finds the stipulated facts accordingly, and we incorporate those facts and the related exhibits herein.[2] Petitioners are husband and wife, and they filed joint Federal income tax returns for the subject years.[3] They resided in or near Waco, Texas, at all relevant times.

---

[1]Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code (Code), Rule references are to the Tax Court Rules of Practice and Procedure, and dollar amounts are rounded.

[2]Petitioners object to certain documents which respondent has introduced into evidence with respect to the "Special Provisions Addendum" (SPA) discussed below, arguing that the Texas parol evidence rule precludes the documents' admission into evidence. The Court reserved ruling on this objection, and we now overrule it. The Texas parol evidence rule does not exclude the documents from evidence because respondent was not a party to the addendum and the documents are not extrinsic evidence which respondent is offering into evidence to vary, add to, or contradict the terms of the addendum. See, e.g., Harville Rose Service v. Kellogg Co., 448 F.2d 1346, 1350 (5th Cir. 1971); Estate of Craft v. Commissioner, 68 T.C. 249, 259-264 (1977), aff'd, 608 F.2d 240 (5th Cir.1979).

[3]Mrs. Davis did not appear or testify at trial but was represented by counsel.

**[\*3]** Waco is in McLennan County, along the Brazos River in the so-called Heart of Texas, approximately 95 miles south of Dallas/Fort Worth, Texas, and approximately 95 miles north of Austin, Texas. Waco has a regional airport and various businesses, hospitals, and educational institutions (including Baylor University). A primary thoroughfare to, from, and through Waco is U.S. Highway 84 (Highway 84), and the subject property is adjacent to the highway.

## II. Relevant Individual and Entities

### A. Mr. Davis

Bob R. Davis is a longtime resident of the Waco area and a longtime entrepreneur and investor in real estate. He began acquiring real estate in the late 1980s, and throughout the years he has owned (directly or indirectly) a variety of real estate in or near Waco. He is a philanthropist interested in helping the Waco community, and he has served on various community boards and committees in the Waco area.

### B. Mr. Perry

Donald Keith Perry has worked in retirement and long-term-care housing administration for approximately 40 years. He worked mainly for Sears Methodist Retirement System, Inc. (SMRS), and its affiliate the Sears Methodist Foundation

[*4] (Foundation). He was the president and chief executive officer of both entities at all relevant times.

C. SMRS

SMRS was a section 501(c)(3) organization headquartered in Abilene, Texas. It built, developed, and operated various sizes of senior living centers throughout northwest Texas. The grounds of its largest campuses include single-family homes, independent living apartments, licensed assisted living, skilled nursing care, and Alzheimer's care.

In 2000 or 2001 SMRS was recruited to see whether it would complete an ongoing project in Waco to build the 120-bed Wesley Woods Alzheimer's Care Facility (Alzheimer's Care). SMRS agreed to assume the contractual liability and completed the project in early 2003. SMRS' work on the project inspired SMRS and the Waco community leaders to establish an additional retirement community (second retirement community) in the Waco area.

D. The Foundation

The Foundation is a section 501(c)(3) organization headquartered in Abilene. It receives, holds, and manages endowment funds for SMRS in the development of SMRS' senior living centers and in the furtherance of SMRS' ministries and missions.

**[*5]**  E. <u>Sun West</u>

Sun West Land, Ltd. (Sun West), is a limited partnership that Mr. Davis and a few other individuals formed to invest in real estate.  Mr. Davis is a limited partner with a minority interest in Sun West.

In 1997 Sun West purchased 525 acres of undeveloped land in Waco, with an intent to develop the land.  The land was near Highway 84 and Old Lorena Road (formerly know as Church Road or alternatively Farm to Market Road, FM No. 2837).  The intersection of Highway 84 and Old Lorena Road is a significant thoroughfare for the Waco community.

III. <u>Mr. Davis' Acquisition of Land</u>

A. <u>Overview</u>

In the fall of 2003, in recognition of the completion of the Alzheimer's Care project, SMRS' bank, a Waco financial institution, hosted a dinner for SMRS officers.  Mr. Davis attended since he was a board member and a shareholder of the Waco financial institution and dined with Mr. Perry and several of his SMRS colleagues.  During that meeting, the parties mentioned that SMRS wanted to establish the second retirement community.  SMRS would require a different location in the Waco area to establish the second retirement community.  Mr. Perry began looking at land in the Waco area in or about 2003 for that purpose.  Mr.

**[\*6]** Davis later informed Mr. Perry that Sun West had land in Waco that would be ideal for the second retirement community and that Sun West could carve out a portion of the land for the retirement community.

B. 73.09-Acre Tract

Mr. Davis and Mr. Perry subsequently toured Sun West's land in or near Waco. The tour included a 73.09-acre tract in Waco along Old Lorena Road, south of Highway 84. The 73.09-acre tract had significant frontage along the eastern side of Old Lorena Road, and the tract spread inward east from Old Lorena Road. Most of the eastern (back) portion of the 73.09-acre tract is a significant portion of what eventually became the subject land[4] and is bordered by the South Bosque River. A significant portion of the South Bosque River border included in the subject land is within a U.S. Flowage Easement.[5] This easement gives the Federal

---

[4]The remainder of the subject land is part of a 47.61-acre tract discussed below as the MCI tract. The Court sometimes refers to the 73.09-acre tract and the 47.61-acre tract as the parent tracts. Included as an appendix are images of the subject land (which roughly resembles the shape of the State of Texas) and each parent tract (the 47.61-acre tract is the upper portion of the images and the 73.09-acre tract is the lower portion of the images). Eventually the parties used a 70.27-acre tract, discussed below as potential servitude property, to provide additional ingress and egress for the parent tract's access to Farm to Market Road/Old Lorena Road, in addition to use as a comparable sale in the appraisal.

[5]The flowage easement was originally granted to the Federal Government for the U.S. Army Corps of Engineers in conjunction with the completion of Lake Waco Dam, which was completed in 1964. See infra appendix, Exhibit 97-P.

[*7] Government the perpetual right to overflow, flood, and submerge lands and to restrict building on the portion of the property encumbered by the easement. Most if not all of the portion is within the U.S. Flowage Easement is also located within a designated 100-year flood zone[6] that the U.S. Federal Emergency Management Agency defines as an area that will be inundated by a flood event having a 1% chance of being equaled or exceeded in any given year (100-year flood zone). The construction of habitable buildings within the 100-year flood zone is prohibited, but the construction of sidewalks, walking or bike trails, or park-like accommodations such as picnic or grilling areas is allowed. Because of the restrictions that portion of the tract featured mature hardwood trees leading down to the river's edge.

After Mr. Davis and Mr. Perry toured the 73.09-acre tract, but before February 12, 2004, Sun West received an unsolicited offer from an unrelated party to buy the tract. Mr. Davis' partners wanted to sell the tract to the offeror. Although the partnership agreement did not contain a mandatory buy/sell provision, Mr. Davis wanted to buy the tract from his partners instead of accepting the previous offer. Sun West accepted Mr. Davis' offer to purchase the 73.09-acre

---

[6]See infra appendix, Exhibit 97-P.

[*8] tract for $694,355 ($9,500 per acre or approximately 22 cents per square foot).[7] His price was $500 per acre less than the unsolicited offer, and Sun West closed the purchase on February 12, 2004.

Contemporaneous with the sale, the bank financing Mr. Davis' purchase retained Bruce Cresson II, an experienced Texas certified general real estate appraiser, to appraise the tract. The 73.09-acre tract was zoned for single family residential use, and Mr. Cresson appraised the 73.09-acre tract for the lender.[8] On the basis of his certified opinion some form of residential use would be the tract's highest and best use. In addition, he used a market (sales comparison) approach under which he analyzed the selling prices of five tracts of nearby vacant land that sold within the 57-month period preceding January 16, 2004, and then, to the extent he considered necessary, adjusting those sale prices to reflect the passage of

---

[7]One acre equals 43,560 square feet.

[8]Incident to his appraisal of the tract, Mr. Cresson recommended that the tract be surveyed to ascertain its exact size and dimensions. Even though the bank appraisal reflected 73.47-acres, the tract had the same metes and bounds description as the subject land. For purposes of the 2004 purchase appraisal, the discussion will refer to the property as 73.09-acres as reflected in the appraisal performed on completion of the subject land's sale.

[*9] time and the differences in location and size.[9] The information that Mr.

Cresson considered in appraising the 73.09-acre tract included the following:[10]

Before adjustments

| Comp No. | Address | Acres | Sale date | Sale price | Price per acre | Zoning |
|---|---|---|---|---|---|---|
| 1 | Richie Road | 20.0 | 12/09/2002 | $260,000 | $13,000 | No zoning |
| 2 | Chapel Road and Richie Road | 25.54 | 04/21/1999 | 241,775 | 9,467 | No zoning |
| 3 | 274 Oak Road | 64.31 | 02/22/2001 | 305,472 | 4,750 | Not listed |
| 4 | Stageline Drive | 15.59 | 11/14/2002 | 350,000 | 22,450 | Residential |
| 5 | Speegleville Road and Oak Road | 49.93 | 08/31/1999 | 278,817 | 5,584 | Residential |

With adjustments

| | Comp No. 1 | Comp No. 2 | Comp No. 3 | Comp No. 4 | Comp No. 5 |
|---|---|---|---|---|---|
| Price per acre | $13,000 | $9,467 | $4,750 | $22,450 | $5,584 |
| Adjustments: | | | | | |
| Time | -0- | + 10% | -0- | -0- | + 10% |
| Location | + 10% | + 10% | + 10% | -0- | -0- |
| Size | - 10% | - 10% | -0- | - 20% | -0- |
| Total adjustments | -0- | + 10% | + 10% | - 20% | + 10% |
| Total $ adjustments | -0- | 947 | 475 | 4,490 | 558 |
| Indicated value | $13,000 | $10,414 | $5,225 | $17,960 | $6,142 |

---

[9]The sales comparison method when used to value real estate compares the real estate to other properties similar in terms of, among other attributes, location, use, zoning, and size and recently sold at arm's-length prices. Negative adjustments are made to the sale prices of the comparable properties to reflect superior attributes of the comparable properties vis-a-vis the subject property, and positive adjustments are made to the sale prices of the comparable properties to reflect inferior attributes of the comparable properties vis-a-vis the subject property. See, e.g., Talkington v. Commissioner, T.C. Memo. 1998-412.

[10]The land underlying comp Nos. 1, 2, 4, and 5 was in Waco and was 3.5 miles, 3 miles, 1.5 miles, and 1 mile, respectively, from the 73.09-acre tract. Although the land underlying comp No. 3 was in McGregor, Texas, it only was 2 miles from the 73.09-acre tract.

**[*10]** Mr. Cresson concluded from his analysis that a "market value range of $9,500 per acre to $10,500 per acre is considered reasonable" for the tract,[11] that the tract was worth $697,965 or $771,425 when valued at $9,500 per acre or $10,500 per acre, respectively, and that the market value of the tract was $735,000 (approximately $10,004 per acre or approximately 23 cents per square foot) as of January 16, 2004.

C. 70.27-Acre Tract

Sun West also owned a 70.27-acre tract of undeveloped land. The tract was essentially L-shaped and wrapped around the southwest corner of Highway 84 and Old Lorena Road, and across the street from the western boundaries of the 73.09-acre and the 47.61-acre tracts. The 70.27-acre tract was zoned for residential use, and Sun West received an offer to buy an undisclosed portion of the 70.27-acre tract at $10,000 per acre. Mr. Davis did not want Sun West to sell any of the 70.27-acre tract to the offeror, and Mr. Davis instead bought the 70.27-acre tract from Sun West on July 7, 2004, at a cost of $770,000 (approximately $10,958 per acre or approximately 25 cents per square foot). Again, Sun West was not required to accept Mr. Davis' offer for the 70.27-acre tract.

_____

[11]Mr. Cresson's appraisal report as to the 73.09-acre tract does not explain the source of the $9,500 or the $10,500. The average indicated value of Mr. Cresson's comparable properties is $10,548.

[*11] Mr. Cresson also appraised the 70.27-acre tract for the lender, opining that the tract's market value as of July 1, 2004, was $914,000 (approximately $13,007 per acre or approximately 30 cents per square foot). He appraised the 70.27-acre tract using a sales comparison approach under which he analyzed the selling prices of four tracts of nearby land in Waco, three of which sold within the 20-month period preceding July 7, 2004, and one of which was under contract for sale, and then, to the extent he considered necessary, adjusting the sale prices to reflect the differences in location, road frontage, zoning, traffic count, site/view, and size. The information that Mr. Cresson considered in appraising the 70.27-acre tract included the following:[12]

Before adjustments

| Comp No. | Address | Acres | Sale date | Sale price | Price per acre | Zoning |
|---|---|---|---|---|---|---|
| 1 | Stageline Drive | 15.59 | 11/14/2002 | $350,000 | $22,450 | Similar |
| 2 | Richie Road | 20.0 | 12/09/2002 | 260,000 | 13,000 | Similar |
| 3 | Highway 84 | 47.0 | Under contract | 564,000 | 12,000 | Similar |
| 4 | China Spring Hghwy & Flat Rock | 73.19 | 10/14/2003 | 1,350,000 | 18,445 | Superior |

[12]Mr. Cresson's appraisal report as to the 70.27-acre tract notes the range of the sale prices of his comparable properties and then states without further explanation that $13,000 per acre was considered a reasonable estimated value of the 70.27-acre tract. The average indicated value of Mr. Cresson's comparable properties is $13,368.

**[*12]**                                        With adjustments

| | Comp No. 1 | Comp No. 2 | Comp No. 3 | Comp No. 4 |
|---|---|---|---|---|
| Price per acre | $22,450 | $13,000 | $12,000 | $18,445 |
| Adjustments: | | | | |
| Location | -0- | 1,300 | -0- | -0- |
| Road frontage | -0- | -0- | 2,400 | -0- |
| Zoning | -0- | -0- | -0- | (1,845) |
| Traffic count | -0- | -0- | -0- | (3,689) |
| Site/view | -0- | -0- | -0- | 1,845 |
| Size | (6,735) | (3,900) | (1,800) | -0- |
| Total adjustments | (6,735) | (2,600) | 600 | (3,689) |
| Indicated value | 15,715 | 10,400 | 12,600 | 14,756 |

D.  MCI Tract

Mill Creek Investments, Ltd. (MCI), is a real estate group whose members included one or more individuals well experienced in the purchase and sale of real estate in the Waco area.  MCI (either individually or collectively with some or all of its members) owned a 47.61-acre tract of land (MCI tract) that is at the southeast corner of Highway 84 and Old Lorena Road and extends eastward along Highway 84 and is next to the 73.09-acre and 70.27-acre tracts.  The eastern edge of the MCI tract is next to the South Bosque River, and 33% of the MCI tract is in the U.S. Flowage Easement and subject to the restrictions of record.

MCI wanted to buy the 73.09-acre tract from Mr. Davis to combine with the MCI tract to maximize the benefit of both tracts as a single tract.  Mr. Davis did not want to sell the 73.09-acre tract, so MCI offered to sell the MCI tract to Mr. Davis.  Mr. Davis purchased the MCI tract on August 2, 2004, after Mr. Perry mentioned that he would desire access to Highway 84 if SMRS were to establish

[*13] the second retirement community on part of the 73.09-acre tract. Mr. Davis

paid $900,000 for the 47.61 acres of the MCI tract (approximately $18,904 per acre

or approximately 43 cents per square foot). Mr. Davis recognized that the most

direct access from the 73.09-acre tract to Highway 84 was through the MCI tract,

and he believed that the value of those two tracts was significantly greater if valued

as one tract rather than two separate tracts.

Mr. Cresson appraised the MCI tract for the lender. The lender instructed

Mr. Cresson to appraise the tract as a 32.76-acre residential tract and a 14.85-acre

commercial tract. He appraised the 32.76-acre tract (beginning on the eastern

boundary of the MCI tract heading westward) as multifamily residential property,[13]

and he appraised the 14.85-acre tract (none of which was eventually included in the

subject land) as commercial property. He appraised the 32.76-acre portion of the

MCI tract at $1,784,000 (approximately $54,457 per acre or approximately $1.25

per square foot) and the 14.85-acre portion of the MCI tract at $1,358,000

(approximately $91,448 per acre or approximately $2.10 per square foot), opining

that the MCI tract's market value as of July 21, 2004, totaled $3,142,000

($1,784,000 plus $1,358,000). He appraised each portion using a sales comparison

[13]Land in the Waco area that is zoned for multifamily residential use may have buildings with more than four families and is generally worth more per square acre (or per square foot) than property zoned for single family residential use.

[*14] approach under which he analyzed the selling prices of various nearby tracts that sold (or were under contract to sell) within the 43-month period preceding July 1, 2004, and then, to the extent he considered necessary, adjusting those sale prices to reflect the differences in location, zoning, traffic control, flood zone/flowage easement, and size.

Mr. Cresson's appraisal of the 32.76-acre portion of the MCI tract took into account three properties which he considered comparable to the 32.76-acre portion. The information that Mr. Cresson considered in appraising the 32.76-acre portion of the MCI tract included the following adjustments to include flood zone and flowage easements:[14]

Before adjustments

| Comp No. | Address | Square feet | Sale date | Sales price | Price/Square foot | Zoning |
|---|---|---|---|---|---|---|
| 1 | 9720 Chapel Road | 174,676 | Under contract | $349,500 | $2.00 | Similar |
| 2 | 901 Old Temple Road | 249,599 | 07/25/2001 | 182,500 | 0.73 | Similar |
| 3 | 9821 Chapel Road | 468,945 | 01/18/2001 | 900,000 | 1.92 | Similar |

---

[14]All three of his comparable properties were in Waco and, by comp No., the properties were 4 miles, 6 miles, and 4 miles, respectively, from the 32.76-acre portion of the MCI tract.

[*15]                                    With adjustments

|  | Comp No. 1 | Comp No. 2 | Comp No. 3 |
|---|---|---|---|
| Price per square foot | $2.00 | $0.73 | $1.92 |
| Adjustments: |  |  |  |
| Location | .20 | .22 | .19 |
| Zoning | -0- | -0- | .58 |
| Traffic count | .60 | .22 | -0- |
| Flood zone/Flowage easement[1] | (.60) | -0- | (.58) |
| Size | (.80) | (.29) | (.58) |
| Total adjustments | (.60) | .15 | (.39) |
| Indicated value | 1.40 | .88 | 1.53 |

[1] Represents a 30% adjustment for the flood zone/flowage easement on the July 1, 2004, appraisal.

## IV.  Mr. Davis' Sale of the Subject Land to the Foundation

### A.  Overview

In October 2004 SMRS completed a market study concluding that the Waco market (including its population, demographic trends, income levels, and competitors in the field) could support a community such as the proposed second retirement community.  Mr. Davis and Mr. Perry discussed a sale of the subject land to the Foundation incident to that study.  The shape of the subject land incidentally roughly resembles the State of Texas and consists of land from two tracts owned by Mr. Davis, that being approximately 35 acres of the 73.09-acre tract and approximately 28 acres of the MCI tract.[15]  The subject land has no frontage on Old Lorena Road, and its "panhandle", which is approximately 30 feet wide at the tip, has frontage only on Highway 84.  Approximately one-third of

---

[15] The subject land is 2,761,268 square feet.  See infra appendix, Exhibit 99-R.

[*16] the subject land (generally towards the north of the property) is zoned for multifamily use, and the remainder of the subject land is zoned for single-family residential use. The subject land is vacant land, with no substantial improvements.

The southern and eastern portions of the subject land adjoin land owned by the U.S. Army Corps of Engineers (which in turn contains the South Bosque River), and approximately 20 acres of the subject land, primarily along its east and south boundaries, is undevelopable land within the 100-year flood zone and/or encumbered by a flowage easement. The portion of the subject land towards the river is scenic with a gradual slope, a riverbank, and mature hardwood trees. The western portion of the subject land is across the street (Old Lorena Road) from the 70.27-acre tract of property Mr. Davis owns and to the east of Old Lorena Road, and the northern portion of the subject land adjoins Highway 84 (to the extent of the approximately 300-foot panhandle) or the property owned by Mr. Davis adjoining Highway 84. The subject land is in a mixed-use neighborhood in Waco, and its immediate neighborhood includes a golf course development with large single-family residences, vacant land, a municipal airport, and several service and retail businesses.

[*17] B. Negotiations

In 2005 the real estate market was thriving and in the spring Mr. Perry and Mr. Davis began seriously negotiating the sale of the subject land. Mr. Perry put little value on the portion of the subject land that was within the 100-year flood zone because the flood zone property could not be developed. Mr. Perry did not object to the flood zone property being included in the sale, however, because they planned a retirement community campus and that portion of the subject land was scenic, with green grass and mature trees, and most of it could be used for recreational pursuits (e.g., picnic areas and playgrounds) and for access to the river.

Mr. Perry first approached Mr. Davis to donate all of the subject land to the Foundation. Mr. Davis replied that he was not financially able to do so. Mr. Davis indicated to Mr. Perry that he wanted $3 million to $4 million for the subject land. Mr. Perry countered that the Foundation would pay $1.6 million. Mr. Davis declined that offer. Mr. Perry informed Mr. Davis that the Foundation could pay no more than $2 million for the subject land, and Mr. Perry suggested to Mr. Davis that he could structure his sale of the subject land to the Foundation as a "bargain sale". Mr. Perry stated that through a bargain sale Mr. Davis could potentially receive $2 million, plus a right to name a building erected on the land and some rights to have family members reside in the second retirement community at

[*18] reduced rates.  Mr. Perry also told Mr. Davis that selling the subject land to the Foundation for less than the land's fair market value also could possibly result in Mr. Davis' being entitled to a charitable contribution deduction.

Mr. Davis was unfamiliar with bargain sales, so he consulted his certified public accountant/tax preparer (CPA), who essentially explained to Mr. Davis that in a charitable setting the difference between a property's fair market value and its sale price results in a charitable contribution.  Mr. Davis was amenable to obtaining a charitable contribution deduction incident to his sale of the subject land to the Foundation, and he asked his CPA's firm to prepare tax projections under different valuation scenarios to quantify the tax savings that could flow from such a sale.  The scenarios indicated that the potential tax benefit of the charitable contribution would increase as the reported value of the property increased.

Mr. Davis and Mr. Perry eventually agreed in principle that as long as the land was appraised at $4.1 million or more the Foundation would pay Mr. Davis $2 million for the subject land.  Afterwards, but incident to that agreement, Mr. Davis retained Mr. Cresson to appraise the subject land.  Mr. Davis did not tell Mr. Cresson that Mr. Davis and Mr. Perry had agreed in principle that the Foundation would pay Mr. Davis $2 million for the subject land.  Eventually, as discussed below, Mr. Cresson appraised the subject land at a market value of $4.1 million as

[*19] of August 29, 2005, contingent upon the entire tract's being zoned for multifamily use.[16]

V. <u>Terms of Sale</u>

On August 25, 2005, Mr. Perry (on behalf of the Foundation) and Mr. Davis signed an "Unimproved Property Contract" (contract) with respect to the sale of the subject land. The contract, prepared by Mr. Davis' real estate attorney, stated that Mr. Davis was selling the subject land to the Foundation for $2 million and that generally the sale would close by September 12, 2005. Also on August 25, 2005, Mr. Davis and Mr. Perry signed a contemporaneously prepared Special Provisions Addendum (SPA), which the contract stated was part of the contract. The SPA essentially specified benefits that Mr. Davis desired be included in the sale. Before Mr. Davis and Mr. Perry attended the closing, their sole discussion of most of these benefits was during a long meeting one night at Mr. Davis' home. Mr. Davis' primary interest in these benefits was to preserve housing and care for his mother in the new second retirement community.

The SPA stated in part that Mr. Davis was selling the subject land to the Foundation at less than its fair market value, that the Foundation was a qualified

---

[16]The 35 acres located in the 73.09-acre tract was zoned only for single family residences and would require an increase zoning designation to allow more than four families per building. The balance of 28 acres was already zoned for multifamily use. See supra note 13.

[*20] charitable organization to which a noncash contribution could be deducted for Federal income tax purposes, and that Mr. Davis could terminate the contract if the subject land was appraised at less than $4.1 million. The SPA also stated that the Foundation would develop and operate the subject land as a retirement center that would include a multistory residential building (tower) and additional single-family dwellings, that the retirement center would provide food preparation and maintenance services, and that the parties to the sale of the subject land "will execute at closing an agreement providing for the following rights of Seller", Mr. Davis, among other rights: (1) the right to name the tower with a name reasonably acceptable to Mr. Davis and to the Foundation; (2) the right to require the Foundation to construct as its first dwelling a single-family model home, using a general contractor designated by Mr. Davis, and to provide certain landscaping and furniture for that model home; (3) the right to select two individuals (from a list of named family members) generally to reside rent free in the model home (or alternatively in the tower upon the payment of a partially refundable entry fee) and with free or discounted meals; and (4) the right to terminate the rights just described in (3) in exchange for a payment equal to the value of those rights. The SPA also stated that (1) Mr. Davis would give the Foundation a "Phase I Environmental Site Assessment" before closing; (2) Mr. Davis would donate land

[*21] on which the Foundation would construct (or otherwise pay for the construction of) a public road from Old Lorena Road to the subject land; (3) Mr. Davis reserved a 12-foot easement along the boundary of the subject land near the river; and (4) Mr. Davis would restrict the use of his land on the same side as Old Lorena Road to development compatible to the Foundation's use and the Foundation would support reasonable zoning changes to that land.

The SPA was later revised on September 1, 2005, with the most significant change being a provision added to the initial version, entitling Mr. Davis to receive $250,000 (with interest in certain cases) in termination of the referenced rights of the seller just described in (1), (2), and (3) if the Foundation eventually opts not to establish the second retirement community or if the Foundation fails to commence construction of the community within 5 years of the sale of the subject land (or generally up to 15 years after that date if Mr. Davis so elects). The executed version of the SPA required the parties to the sale to "execute at closing an agreement providing for the following rights of Seller". Mr. Davis had asked Mr. Perry to draft such an agreement.

**[*22]** VI. <u>Closing</u>

The transaction closed on September 9, 2005, with Mr. Davis selling the subject land to the Foundation for $2 million in cash.[17]  Mr. Davis had also delivered a Phase I environmental site assessment before closing.  Mr. Davis executed a warranty deed conveying the subject land to the Foundation, subject to his reserving a 12-foot-wide easement for ingress and egress from the river to his property adjacent to the subject land.

At closing Mr. Perry presented to Mr. Davis a proposed memorandum of understanding that Mr. Perry believed clarified what he and Mr. Davis had agreed to in the SPA.  Because of differences between Mr. Perry's proposed memorandum of understanding and Mr. Davis' understanding of the SPA, Mr. Davis refused to sign the memorandum of understanding at the closing.  Mr. Davis nevertheless proceeded to execute the deed and other closing documents required in the sale and completed the conveyance of the subject land to the Foundation.  Mr. Davis wanted to make a contribution to benefit the community of Waco, and he was impressed by the mission of SMRS and believed a contribution to SMRS (either directly or indirectly through the Foundation) would benefit SMRS' charitable mission and the community of Waco.

---

[17]Mr. Davis' basis in the subject land as of that time was $834,076.

[*23] VII.  <u>Subsequent Events Concerning the SPA</u>

At or just after the closing, Mr. Davis gave the memorandum of understanding to his attorney to compare it with the SPA.  His attorney, having reviewed the memorandum, advised Mr. Davis that he and Mr. Perry had different understandings as to some of the provisions in the SPA and that Mr. Davis should confirm in writing at the earliest opportunity their common understanding of those provisions.  After closing Mr. Davis never asked his attorney to prepare a revised memorandum as to the rights set out in the SPA, and Mr. Perry never delivered a revised memorandum to Mr. Davis.  Because both Mr. Perry and Mr. Davis believed that the SPA provisions required a final document to be executed at the closing, neither Mr. Perry nor Mr. Davis believed that the provisions executed before the closing agreement constituted a final agreement to be included in the final sale documents.

VIII.  <u>Letter of Acknowledgment</u>

SMRS sent Mr. Davis a letter dated October 13, 2005, thanking him for his "extraordinary gift" to the Foundation in the form of the sale for $2 million of the subject land which was appraised at $4.1 million.  The letter states:

> I want to thank you for your extraordinary gift to the Sears Methodist Foundation in the form of the bargain sale of 63.39 acres out of the H. Roberts Survey at Hwy 84 near Church Road in Waco, Texas.

**[*24]** The certified appraised value of the above described property was $4.1 million, and the bargain sales price was $2 million. Therefore, your gift to the Foundation was $2.1 million.

Your CPA will need to complete and file IRS Form 8283 [Noncash Charitable Contributions]. The form requires our signature as well as yours and the appraiser's. We will be glad to provide our signature when that form is ready.

Sears strives to set the standards for our industry, and because of people like you, we are able to provide the highest quality of care for our residents. Thank you for being a part of that vision.

IX. Federal Income Tax Returns

A. Overview

Petitioners' 2005 return includes Form 8283, of which page 2 reports a $2.1 million contribution through a bargain sale of $4.1 million of undeveloped land for $2 million and identifies the undeveloped land as the subject land. They included in their 2005 return Mr. Cresson's "Complete--Self-Contained Appraisal Report", dated August 30, 2005 (August 2005 appraisal), opining that the market value of the subject land was $4.1 million as of August 29, 2005.

Petitioners calculated the $2.1 million charitable contribution deduction as the difference between the $4.1 million appraised value and the $2 million that the Foundation paid to purchase the subject land. Applying applicable legal limitations on deductibility, they applied $566,960 of the $2.1 million for 2005.

[*25] They carried over and applied $416,390 and $170,981 of the $2.1 million charitable contribution deduction to their 2006 and 2007 returns, respectively.

### B. August 2005 Appraisal

Mr. Cresson appraised the subject land using a sales comparison analysis and assumed that the land was zoned entirely for multifamily use.[18] For purposes of his analysis, he referenced sales of three nearby comparable properties which occurred between January 2001 and October 2004. Each of those properties was zoned for multifamily use. The first and third comparable property sales were the October 13, 2004, sale of the vacant land at 9720 Chapel Road and the January 18, 2001, sale of the vacant land at 9821 Chapel Road.[19] The second sale of comparable property was the December 30, 2003, sale (as Mr. Cresson listed it) of

---

[18]While the zoning for the subject land was actually split between single-family residential use and multifamily use, the Court finds this assumption to be reasonable. Mr. Cresson opined that the City of Waco typically accommodates zoning changes where, as here, the person requesting the change owns the surrounding property, and respondent's expert, after consulting with representatives of the City of Waco zoning department, agreed that Mr. Cresson's multifamily zoning assumption was reasonable.

[19]Mr. Cresson stated in his appraisal report that the land at 9720 Chapel Road amassed 182,037 square feet, that the sale price was $364,074, and that the price per square foot was $2.16. Mr. Cresson's August 2005 appraisal did not explain why these amounts are different from the corresponding amounts set forth in his 2004 appraisal of the 32.76-acre portion of the MCI tract. However, review of the record reflects the 2004 comparison verification of consideration was "under contract", and verification of the consideration in 2005 came from deed records.

[*26] a 501,811-square foot tract of vacant land at New Road between Bagby Avenue and I-35 (seven miles from the subject land) for $1.2 million ($2.39 per square foot).[20] At the direction of Mr. Davis, Mr. Cresson did not consider the sale price information of the two parent tracts, nor did Mr. Davis share that sales information with Mr. Cresson (although Mr. Cresson asked him for such information).

Mr. Cresson concluded in his appraisal that his comparable properties had unadjusted sale prices per square foot of $2.16, $2.39, and $1.92, respectively. He then adjusted the sale prices to account for his comparable properties' locations (concluding that the comparable properties' locations were inferior to that of the subject land and thus requiring positive adjustments of 10%, 15%, and 10%, respectively) and sizes (concluding that the comparable properties' sizes were superior to that of the subject land and thus requiring negative adjustments of 60%, 55%, and 55%, respectively), and to reflect his conclusions that (1) the traffic count made his comparable properties inferior to the subject land (positive adjustments of 20%, 5%, and 20%, respectively); (2) his comparable properties were superior to the subject land in that the comparable properties were not within a flood zone (negative 30% adjustment as to each comparable property); and (3)

---

[20]This "sale" was actually an option on the land that reverted to the seller without money ever changing hands.

[*27] his comparable properties were inferior to the subject land in terms of the proximity to river frontage and wooded areas (positive 30% adjustment as to each comparable property).[21] He concluded from his analysis that the per square foot values of his comparable properties after adjustments were $1.51, $1.55, and $1.44, respectively, and that a market value range of $1.45 to $1.55 per square foot was reasonable for the subject land. He calculated that the value of the subject land thus ranged from $4,003,839 (63.39 acres × 43,560 square feet per acre × $1.45) to $4,279,965 (63.39 acres × 43,560 square feet per acre × $1.55) and concluded that the market value of the subject land was $4.1 million (approximately $64,679 per acre or approximately $1.49 per square foot).

X. Notice of Deficiency

On July 19, 2010, respondent issued a notice of deficiency to petitioners for 2005, 2006, and 2007 denying the entirety of the claimed charitable contribution deductions. The notice reflects respondent's determination that petitioners may not deduct any of the charitable contributions claimed on their 2005 through 2007 tax returns as to the subject land because they failed to substantiate the reported contributions.

---

[21]Mr. Cresson's 30% negative adjustment for the 100-year flood zone in (2) was made as to the same portion of the subject land to which he made the 30% positive adjustment for river frontage and wooded areas in (3).

**[*28]**                                    OPINION

## I. Overview

The Court must decide whether petitioners may deduct their reported $2.1 million charitable contribution. Petitioners argue that the Court should decide this issue in the affirmative because the fair market value of the subject land was $4.1 million at the time of the sale and Mr. Davis sold the land to the Foundation for $2.1 million less than its fair market value with an intent to contribute the $2.1 million excess value to the Foundation. Respondent advances three arguments to the contrary. First, respondent argues that Mr. Davis lacked a charitable intent when he sold the subject land to the Foundation. Second, respondent argues, petitioners did not satisfy the contemporaneous written acknowledgment requirement of section 170(f)(8). Third, respondent argues, the fair market value of the subject land as of the time of the sale did not exceed the $2 million sale price.

The Court agrees with petitioners that they made a charitable contribution upon the sale of the subject land to the Foundation, but the Court disagrees with petitioners that their charitable contribution deduction is $2.1 million.

**[*29]** The Court sets forth our analysis below. It begins with a discussion of the credibility of the fact witnesses and of the burden of proof. The Court then turns to discussing the substantive issue at hand.

II. Fact Witnesses

The Court decides each fact witness' credibility for purposes of evaluating his testimony. The Court then weighs the testimony and each piece of documentary evidence, draws appropriate inferences, and chooses between conflicting inferences in finding the facts of this case. The mere fact that a witness' testimony may be unopposed does not necessarily mean that the Court will find the testimony credible. The Court will not accept the testimony of witnesses at face value to the extent the Court perceives the testimony to be incredible or otherwise unreliable. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 84 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

The Court generally finds each fact witness credible. The Court accepts their testimony unless otherwise stated.

III. Burden of Proof

Petitioners argue in their opening posttrial brief that respondent bears the burden of proof under section 7491(a)(1). The Court disagrees.

**[*30]** The Commissioner's determinations set forth in a deficiency notice are generally presumed correct. See Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Rule 142(a)(1). Section 7491(a)(1), however, provides an exception that shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if (1) the taxpayer introduces credible evidence with respect to the issue and (2) the taxpayer proves certain other conditions, such as that the taxpayer complied with the substantiation requirements set forth in the Code and maintained all records required by the Code. See sec. 7491(a)(1) and (2); Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).

The Court previously denied petitioners' pretrial motion to shift the burden of proof and petitioners have not persuaded us that the Court should revisit that ruling. The Court concludes that petitioners bear the burden of proof, and the Court holds accordingly. The Court notes, however, that we decide this case on the basis of a preponderance of the evidence, without regard to which party bears the burden of proof. See Knudsen v. Commissioner, 131 T.C. 185, 188-189 (2008); see also Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), aff'g T.C. Memo. 2003-212.

[*31] IV. Charitable Contributions

A. Overview

Individual taxpayers such as petitioners generally may deduct for a taxable year the charitable contributions that they made during the year. See sec. 170(a)(1). Where the total charitable contributions exceed a certain threshold or are a contribution of certain capital gain property, however, the excess amount is generally carried over to future years in the manner prescribed in the Code. See sec. 170(b)(1), (d)(1)(A). Where a taxpayer receives a substantial benefit in exchange for a contribution of property to a charitable organization, a charitable deduction is permitted only to the extent that (1) the fair market value of the property exceeds the fair market value of the benefit conferred and (2) the excess contribution is made with charitable intent and without the receipt or expectation of receipt of adequate consideration. See Hernandez v. Commissioner, 490 U.S. 680, 690 (1989); United States v. Am. Bar Endowment, 477 U.S. 105, 116-118 (1986); see also Rolfs v. Commissioner, 135 T.C. at 480; sec. 1.170A-1(h)(1) and (2), Income Tax Regs. Taxpayers aiming to deduct charitable contributions must satisfy substantiation requirements fixed by reference to the amount of the deduction claimed. See generally sec. 1.170A-13, Income Tax Regs.

**[*32]** B. Charitable Intent

Respondent argues that Mr. Davis lacked any charitable intent when he sold the subject land to the Foundation. Respondent notes that Mr. Davis negotiated with Mr. Perry over the price at which he would sell the land to the Foundation and that Mr. Davis structured the transaction as a contribution in part only after Mr. Perry informed Mr. Davis of the concept of a bargain sale. Respondent also argues that Mr. Davis lacked a charitable intent because he desired the tax benefits flowing from a charitable contribution. Respondent also argues that Mr. Davis lacked a charitable intent because he received sufficient consideration for the subject land in the form of $2 million plus other items consisting of the proposed residency benefits, an easement over part of the land, the right to compel the Foundation to pay for the construction of a road and to compel the Foundation to support zoning changes to Mr. Davis' nearby property, and the right in certain cases to a termination payment. The Court disagrees with respondent's arguments.

The Court finds that as of the time of the sale Mr. Davis believed that he was selling the subject land to the Foundation for less than its fair market value and that he intended to transfer the excess value to the Foundation as a charitable contribution. See Am. Bar Endowment, 477 U.S. at 118 ("[The] sine qua non of a charitable contribution is a transfer of money or property without adequate

[*33] consideration."); see also Hernandez v. Commissioner, 490 U.S. at 690-691 (noting that the expectation of a quid pro quo is typically viewed through the external features of the transaction at hand, rather than through the subjective motivations of the parties thereto). The mere fact that Mr. Perry suggested conveying the subject land to the Foundation in part as a charitable contribution does not mean, as respondent contends, that Mr. Davis lacked a charitable intent as of the time of the sale. A finding of such an intent rests not on events that may have occurred before the sale but on Mr. Davis' intent at the time of the sale. The Court finds in the record that Mr. Davis appreciated and believed in SMRS' mission and activities, and in the benefit of having the second retirement community in the Waco area. To be sure, Mr. Davis even went so far as to transfer the subject land to the Foundation although he learned at the closing that the residency and certain other benefits which he desired be included in the transaction would not be included (as discussed below). As Mr. Davis explained at trial, the failure to agree on those benefits did not justify thwarting the transaction, given the value of the transaction to SMRS and to the Waco community.

Respondent also argues that petitioners are not entitled to deduct their reported $2.1 million charitable contribution because Mr. Davis received or expected to receive significant benefits from the residency rights and from an

[*34] appreciation in the value of his surrounding property on account of the Foundation's establishment of the second retirement community. The Court disagrees. Mr. Davis received no benefit from the residency rights in that those rights, although desired by Mr. Davis to be included in the sale, were not ultimately included. The SPA explicitly required that the parties thereto execute a document at closing providing for such rights, and the parties to the sale failed at the closing to execute the necessary paperwork to fulfill this requirement. Mr. Davis and Mr. Perry disagreed at the closing as to their understandings of those benefits and the inclusion of those benefits in the sale, and they did not follow up on the formalization or implementation of any of the rights.[22]

The Court also disagrees with respondent's assertion that a charitable intent was lacking because Mr. Davis investigated the tax benefits of a bargain sale in connection with the sale of the tract and was motivated in part to obtain such a

---

[22]Mr. Davis and Mr. Perry each testified that they do not believe that the residency and meal provisions and the related termination payment provision are enforceable given that the requisite paperwork was not executed at closing. Mr. Perry also confirmed that the $250,000 termination fee was not and had not ever been reflected as an obligation of the Foundation on its books and records. Respondent invites the Court to disregard this testimony as unreliable. To that end, respondent states, this testimony benefits Mr. Davis in that it supports his tax deduction and benefits Mr. Perry because the Foundation does not have to pay the significant termination fee. The Court declines respondent's invitation to disregard this testimony given our credibility findings as to Mr. Perry and Mr. Davis. Nor does the Court find, as respondent asks us to, that Mr. Davis expected to receive these benefits; nor did he have the legal right to compel their payment.

[*35] deduction to the maximum amount possible.  See Scheidelman v. Commissioner, 682 F.3d 189, 200 (2d Cir. 2012), vacating and remanding on other grounds T.C. Memo. 2010-151; Skripak v. Commissioner, 84 T.C. 285, 319 (1985).  The Court similarly rejects respondent's contention that a charitable contribution deduction should not be allowed here because the $2 million in consideration that Mr. Davis received may have exceeded his basis in the property.  What is important is not what Mr. Davis paid for the property but what the property was worth at the time of the contribution.[23]

Nor does the Court agree with respondent's assertion that Mr. Davis lacked a charitable intent because, as respondent states, Mr. Davis received significant benefits in addition to the $2 million in consideration.  First, as mentioned above, Mr. Davis never received (or was entitled to receive) the residency benefits.  Second, respondent is incorrect to assert that Mr. Davis received an easement; Mr. Davis retained an easement in the land and thus that property interest never passed to the Foundation.  See Stark v. Commissioner, 86 T.C. 243 (1986).  Moreover, the 12-foot easement was insignificant in the overall scheme of the transaction in that Mr. Davis' use of the 12-foot easement along the river's edge would not defeat or

---

[23]Neither the notice of deficiency nor respondent has set forth any arguments that Mr. Davis was a dealer in real estate and therefore contributing inventory limited to basis.  See sec. 170(e)(1), (3).

[*36] otherwise interfere with the Foundation's use of the subject land.  See id. at 252-253 (charitable contribution deduction allowed as to a bargain sale of property where the taxpayer retained insubstantial mineral interests in the property).  Third, the Foundation's obligation to pay for the construction of the road and the Foundation's agreement to support the zoning changes suffer from a similar infirmity.  The construction of the public road was a joint project under which Mr. Davis would donate a significant tract of the land across his property necessary to build the road for the retirement community to have access to Old Lorena Road to the west of the subject property, and the Foundation would build (or provide the funds for) that road.  Mr. Davis also agreed to limit the use of his property that was the subject of the zoning change in concert with the Foundation's agreeing to support the zoning change.  Moreover, as to the construction of the public road and the support of the zoning change, any theoretical benefit that passed to petitioners over and above the benefit to the Foundation was incidental and insignificant to the benefit to the community and to the transaction as a whole.  McLennan v. United States, 23 Cl. Ct. 99 (1991), further proceedings, 24 Cl. Ct. 102 (1991), aff'd, 994 F.2d 839 (Fed. Cir. 1993); cf. Citizens & S. Nat'l Bank of S.C. v. United States, 243 F. Supp. 900 (W.D. S.C. 1965).  Fourth, any speculative increase in the value of Mr. Davis' nearby property fails to vitiate or otherwise erode his charitable

[*37] intent in that he could not compel the construction of the retirement community. In addition, any such future increase in the value of Mr. Davis' nearby property would not be a direct product of the contribution but would be more appropriately tied to the operation of the real estate market in Waco.

The Court concludes and holds that Mr. Davis had the requisite charitable intent at the time of the sale.

C. Contemporaneous Written Acknowledgment

Respondent argues that petitioners fail the contemporaneous written acknowledgment requirement. To that end, respondent asserts, petitioners failed to obtain a statement that meets the requirements of section 170(f)(8). Petitioners argue that the October 2005 letter meets that requirement in that it describes the property that Mr. Davis contributed to the Foundation and noted that the Foundation provided $2 million in goods or services (i.e., the cash) in connection with the contribution. Respondent rebuts that the letter fails as a contemporaneous written acknowledgment because it did not disclose the goods and services, other than the $2 million, that Mr. Davis received in connection with the sale.

A taxpayer making a charitable contribution of $250 or more must obtain a contemporaneous written acknowledgment from the donee in order to deduct a charitable contribution under section 170. See sec. 170(f)(8)(A). A written

[*38] acknowledgment is contemporaneous where the taxpayer obtains the acknowledgment on or before the earlier of: (1) the date the taxpayer files a return for the year in which the taxpayer made the contribution; or (2) the due date, including extensions, for filing that return. See sec. 170(f)(8)(C). An acknowledgment may be a contemporaneous written acknowledgment only if it includes in relevant part: (1) the amount of cash and a description (but not value) of any property other than cash contributed; (2) whether the donee organization provided any goods or services in consideration, in whole or in part, for the contributed property; and (3) a description and good-faith estimate of the value of any goods or services provided. See sec. 170(f)(8)(B). Goods or services include "cash, property, services, benefits, and privileges", sec. 1.170A-13(f)(5), Income Tax Regs., and a donee provides goods or services as consideration if the donor expects at the time the donation is made to receive the goods or services (even in a later year) in exchange for the donation, see id. subpara. (6); see also Viralam v. Commissioner, 136 T.C. 151, 169 (2011).

The Court finds that petitioners complied with the contemporaneous written acknowledgment requirement. As discussed above, Mr. Davis did not receive any goods or service other than the $2 million in consideration of his sale of the subject land. Respondent concedes in his posttrial surreply brief that petitioners met the

**[*39]** contemporaneous written acknowledgment requirement if goods or services in addition to the $2 million were not received or expected to be received. The Court thus holds for petitioners on this dispute.

### D. Fair Market Value

#### 1. Overview

Petitioners argue that the fair market value of the subject land was $4.1 million at the time of the sale. Respondent argues that the applicable fair market value was not more than $2 million.

#### 2. Applicable Standards

Fair market value is a question of fact, and the trier of fact must weigh all relevant evidence of value and draw appropriate inferences. See Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. Nat'l Grocery Co., 304 U.S. 282, 294 (1938); see also Chapman Glen Ltd. v. Commissioner,140 T.C. 294, 324 (2013). Fair market value is measured on the applicable valuation date, which, in this case, is the date of Mr. Davis' sale of the subject land to the Foundation. See sec. 170(a); Chapman Glen Ltd. v. Commissioner, 140 T.C. at 324; sec. 1.170A-1(c)(1), Income Tax Regs. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having

[*40] reasonable knowledge of the relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs. The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the characteristics of these hypothetical persons are not always the same as the personal characteristics of the actual seller or a particular buyer. See Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990). Fair market value reflects the highest and best use of the property on the valuation date, and the reasonable and objective possibilities for the property establish that use. See Mitchell v. United States, 267 U.S. 341, 344-345 (1925); United States v. Meadow Brook Club, 259 F.2d 41, 45 (2d Cir. 1958); Symington v. Commissioner, 87 T.C. 892, 896 (1986); Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986).

### 3. Expert Testimony in General

Each party relies upon an expert to establish the applicable fair market value of the subject land. Expert testimony is admissible where it assists the Court to understand the evidence or to determine a fact in issue, see Fed. R. Evid. 702; see also ASAT, Inc. v. Commissioner, 108 T.C. 147, 168 (1997), and the Court has broad discretion to evaluate the cogency of an expert's analysis, see Gibson & Assocs., Inc. v. Commissioner, 136 T.C. 195, 229-230 (2011). The Court weighs

[*41] an expert's testimony in light of his or her qualifications and with due regard to all other credible evidence in the record. The Court may embrace or reject an expert's opinion in toto, or the Court may pick and choose the portions of the opinion to adopt. See Helvering v. Nat'l Grocery Co., 304 U.S. at 294-295; see also Gibson & Assocs., Inc. v. Commissioner, 136 T.C. at 230. The Court is not bound by an expert's opinion and will reject an expert's opinion to the extent that it is contrary to the judgment we form on the basis of our understanding of the record as a whole. See Gibson & Assocs., Inc. v. Commissioner, 136 T.C. at 230.

### 4. Identity of Experts

#### a. Mr. Cresson

Petitioners called Mr. Cresson to testify as an expert on the valuation of real estate, and the Court recognized Mr. Cresson as such an expert with no objection by respondent. The Court also received into evidence with no objection by respondent two expert reports that Mr. Cresson prepared that served as Mr. Cresson's direct testimony in this case. See Rule 143(g)(2). The first report was Mr. Cresson's August 2005 appraisal, which reflected his opinion that the market value of the subject land was $4.1 million as of August 29, 2005. The second report, dated August 12, 2011, contained "Supplemental Information" relevant to Mr. Cresson's August 2005 appraisal.

[*42] Mr. Cresson was raised in Waco, and he graduated from Baylor University in 1990 with a bachelor of business administration degree, majoring in finance and real estate. He began working for Bridgewood Properties, a Waco valuation firm, doing real estate appraisals, in 1990, and he purchased the company in 2000. He is a Texas general certified real estate appraiser, and he appraises both residential and commercial property. For the last approximately 15 years, he has focused 95% of his work on commercial property, primarily on behalf of banks and other lending institutions. He is a longstanding member of the Waco Association of Realtors and of the Texas Association of Realtors.

### b. Mr. Ward

Respondent called Donald L. Ward, MAI, AVA, to testify as an expert on real estate valuation. The Court recognized Mr. Ward as such an expert and over petitioners' objection received into evidence his expert witness report and his memorandum responding to the supplemental information provided by Mr. Cresson. Petitioners' primary objection to Mr. Ward is their claim that he is inherently biased because he is employed by the Internal Revenue Service (IRS).

Mr. Ward is a senior appraiser with approximately 40 years of experience in both the private and the public (IRS) sectors, and he has worked for the IRS since September 2006. He has been a member of the Appraisal Institute since 1991 and

[*43] is an AVA designee of the National Association of Certified Valuation Analysts. He has held a Texas broker's license since 1974. He has been a training instructor in IRS appraisal classes, and he has taught appraisal classes at a junior college. He has previously testified as an expert witness in U.S. District Courts in Texas.

Respondent retained Mr. Ward to review Mr. Cresson's August 2005 appraisal and to render an opinion on the fair market value of the subject land. Mr. Ward concluded that Mr. Cresson's analysis is "deeply flawed in numerous respects" and that his resulting conclusion of market value is wrong. Mr. Ward opined that the fair market value was best determined by analyzing the sale prices that Mr. Davis paid to acquire the two parent tracts, the 70.27-acre tract, and the price that the Foundation paid Mr. Davis for the subject land. Mr. Ward concluded that the fair market value of the subject land was $1.69 million as of August 29, 2005, and could be higher only if the items in the SPA added value to the $2 million that the Foundation paid for the subject land.

### 5. Court's Impression of the Experts and Their Opinions

With the exceptions discussed below, the Court finds Mr. Cresson's opinion to be more persuasive than Mr. Ward's opinion as to the applicable fair market value of the subject land.

**[*44]** Mr. Cresson is a longtime, experienced, well-credentialed local appraiser familiar with real estate in the Waco area. He credibly opined that the real estate market in Waco generally causes the price per acre for tracts of property to be higher as the tracts get smaller. He also credibly opined that the subject land could likely be rezoned to multifamily residential use and that multifamily residential property typically sells for more per square foot than single family residential property. He valued the subject land reasonably assuming that the highest and best use of the land would be for multifamily residential use and that such use would include multifamily complexes such as an executive apartment complex. He analyzed arm's-length sales of properties from the relevant Waco area which he ascertained were comparable to the subject land, he generally made reasonable adjustments to those properties' sale prices to equate the underlying properties with the subject land, and he arrived at a conclusion of value as to the subject land.

Respondent faults Mr. Cresson's appraisal of the subject land, asserting primarily that the fair market value of the subject land is best measured by Sun West's sales of the two parent tracts to Mr. Davis and by Mr. Davis' purchase of the third tract. Respondent also criticizes Mr. Cresson for not using the Old Temple Road land as a comparable property, which he had previously used as a comparable for a July 2004 appraisal in the 32.76-acre portion of the MCI tract that

**[*45]** was already zoned for multifamily use and is wholly incorporated in the subject land.  The Court disagrees with respondent on the first point but agrees with respondent on the second.  The probative value of an actual sale price is at a low ebb where a material change in circumstances occurs between the valuation date and the date of sale, see, e.g., Wortmann v. Commissioner, T.C. Memo. 2005-227, slip op. at 13 (recognizing that "The weight given to an actual sale price is greatly diminished, however, where a material change in circumstances occurs between the valuation date and the date of sale."); cf. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1233 (1987), and the parent tracts were materially changed after they were sold to Mr. Davis but before the applicable valuation date, in that the Foundation did not acquire any of the parent tracts in the whole.

The subject land is not representative of either parent tract as it was sold to Mr. Davis in that the subject land is a combination of attractive portions of the parent tracts that results in favorable zoning, highway frontage, buildable space, and river frontage.  The blend of the selected portions of each parent tract into the subject land created significant value that was not present in either parent tract when it was sold to Mr. Davis.  To be sure, both Mr. Davis and the previous owners of the MCI tract were deeply experienced and knowledgeable on the Waco real estate market, and they believed that it was best (and we infer most profitable)

[*46] to own both the 73.09-acre tract and the MCI tract, as opposed to owning either of those tracts alone. The fact that the total value of two tracts may be significantly greater if they are valued as a single tract also was acknowledged by Mr. Ward. He opined that the concept of "plottage" (also known as "assemblage") reflects the reality that assembling two or more tracts of land may produce greater utility (and may be worth more) than considering them separately. Treatises on the subject of valuation also have stated similarly. See, e.g., John A. Bogdanski, Federal Tax Valuation, para. 2.01[2][c], at 2-32 through 2-37 (2012) (discussing cases involving assemblage and other special needs values). The Court also notes the value that inhered in the subject land as a single tract given, as Mr. Cresson credibly observed, the healthy economic environment surrounding the subject land and the fact that the tract was in an excellent area for long-term real estate investment.

The Court agrees with respondent, however, that Mr. Cresson should have taken into account the sale of the vacant land at 901 Old Temple Road. The Old Temple Road property was zoned for multifamily residential use, and the sale was more recent than the sale of the land at 9821 Chapel Road that Mr. Cresson took into account. Also, the Old Temple Road land was apparently similar to the subject land from the point of view of the flood zone and the flowage easement. In

[*47] addition, petitioners have not adequately explained why Old Temple Road, while an appropriate comparable property for the 2004 appraisal of the 32.76-acre portion of the MCI tract and wholly incorporated into the subject land, would fail to be an appropriate comparable property in the 2005 appraisal of the subject land. Petitioners have set forth no persuasive reason as to why a hypothetical buyer and a hypothetical seller would not consider the sale of the land at Old Temple Road to be a reasonable measure of the fair market value of the subject land, and the Court concludes that they would take that sale into account. Nor does the Court see why the hypothetical parties would not consider the same if Mr. Cresson's previous adjustments from the 2004 appraisal leading to his indicated value for the Old Temple Road to be reasonable as well. For purposes of determining the applicable fair market value of the subject land, the Court finds that Mr. Cresson's appraisal should include the property previously used on the parent tract and the Old Temple Road sale price subject to applicable adjustments for the subject property.

Respondent also asserts that Mr. Cresson did not properly reflect adjustments for (1) time, (2) location, (3) traffic count, and (4) river/trees.[24] The Court disagrees with respondent's assertion as to the first three adjustments but

_____

[24]Respondent also asserts that Mr. Cresson's adjustment for zoning was inappropriate. As stated above, however, the Court finds that adjustment to be proper.

**[*48]** agrees with respondent's assertion as to the fourth adjustment. The value of real estate in the Waco area increased during the relevant period; thus, Mr. Cresson's decision not to make a time adjustment hardly supports respondent's claim that Mr. Cresson failed to make such an adjustment to inflate the value of the subject land. Likewise, the subject land is in a location different from that of the comparable properties, and the Court finds nothing in the record to support respondent's assertion that the minimal discounts that Mr. Cresson took into account to reflect the different locations is inappropriate. Similarly, respondent acknowledges that traffic count is a positive element for commercial property but stops short of agreeing that it also is a positive element of multifamily residential property. Visibility is advantageous for a multifamily housing facility such as that planned here in that a visible location in a major thoroughfare of an affluent and growing area of town is a good source of advertising for potential residents; the size of the property also affords residents seclusion and privacy.

The Court does not agree, however, with Mr. Cresson's fourth adjustment; i.e., for rivers and trees in the portion of the subject land within the 100-year flood zone and restricted by the flowage easement granted to the Federal Government for the U.S. Army Corps of Engineers. Mr. Ward opined persuasively through his report that appraisers generally discount the value of land in a flood zone because

**[\*49]** of use restrictions, that some appraisers conclude that land in a flood zone has no value, and that most appraisers conclude that land in a flood-prone area has some contributory (e.g., aesthetic) value though less than if the land were buildable land. Petitioners ask the Court to disregard this testimony because, they claim, Mr. Ward is inherently biased because he is employed by the IRS. The Court declines to do so. Petitioners had ample opportunity to cross-examine Mr. Ward as to any potential bias, and they opted not to do so. Vigorous cross-examination is a traditional and appropriate means of attacking admissible evidence that a party believes is shaky, see Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993), and petitioners' failure to cross-examine Mr. Ward to elicit evidence in support of their claim of bias lends no support to that claim.

Mr. Cresson made a 30% negative adjustment to the subject land's value against the comparable properties because of the 100-year flood zone but then offset that adjustment entirely with a 30% positive adjustment for the river and the trees in the 100-year flood zone. As Mr. Cresson sees it, the diminution in value of the subject land due to its location in the 100-year flood zone and restricted by a previously existing flowage easement granted to the Federal Government for the U.S. Army Corps of Engineers is completely offset by an increase in the value of the land derived from the river and trees. The Court disagrees. The Court is

[*50] unaware of any market data supporting Mr. Cresson's conclusion that the value of vacant land in the 100-year flood zone subject to a flowage easement is the same as if that vacant land were not encumbered by the easement and outside the 100-year flood zone, and Mr. Ward persuasively stated that he is unaware of any such data either. While trees and proximity to a river may be desirable, the Court tends to believe that hypothetical parties to a sale would not add value for that feature in an amount that would completely offset any decreased value from the building restrictions and the other negative aspects that go with being in the 100-year flood zone. The Court also notes that Mr. Cresson's appraisal of the 32.76 acres of the MCI tract, which includes much of the same 100-year flood zone land, reflected a 30% flood zone adjustment against two identical comparable properties with no corresponding adjustment for the river and trees. While Mr. Cresson testified that he concluded that a 30% positive adjustment for aesthetic value was necessary only after he walked down to the river and saw the beauty from that view, the Court declines to rely upon this testimony. Mr. Cresson stated before walking the subject land that it was worth $4.1 million and his ultimate conclusion is the same. If his testimony on that fact was earnest, then his upward adjustments for scenic beauty should have naturally returned a value higher than his preliminary opinion.

[*51] All the same, the Court agrees with Mr. Cresson to the extent that he opined that the 100-year flood zone restrictions add value to the subject land on account of the sanctuary that comes with viewing the area's seclusion.  Mr. Ward concluded that a 15% negative adjustment should be taken into account to reflect the sanctuary derived from the flood zone restrictions, and the Court believes in the setting at hand that such an adjustment is appropriate.  For purposes of determining the applicable fair market value of the subject land, the Court adopts Mr. Ward's 15% negative adjustment to reflect the sanctuary derived from the 100-year flood zone restrictions and replaces in Mr. Cresson's appraisal of that land a negative 15% adjustment for a negative 30% adjustment that corresponds to reflect the aesthetic beauty on account of the river and of the trees in the 100-year flood zone.

E.  Conclusion

The Court determines the applicable fair market value of the subject land by reference to the adjusted sale prices of four comparable properties:  9720 Chapel Road, 9821 Chapel Road, New Road, and 901 Old Temple Road.  In addition, the adjusted sale price for the properties should reflect a 15% adjustment versus a 30% adjustment for river frontage and wooded area where applicable.  The Court further concludes on the basis of our finding that the subject land was sold for $2 million that petitioners may claim a charitable contribution deduction with respect to the

[*52] sale. Petitioners claimed a $566,960 charitable contribution deduction for 2005; and upon a preliminary calculation based upon the adjustments determined in the Court's opinion, the Court thus sustains that deduction in full. Petitioners also claimed a $416,290 charitable contribution deduction for 2006 and a $170,981 charitable contribution deduction for 2007.[25]

The Court has considered all arguments that the parties made for holdings contrary to those that the Court had reached herein and, to the extent not discussed, the Court has rejected those arguments as without merit. The balance of the charitable contribution deduction shall be determined in full under a Rule 155 determination.

In order to reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[25]The balance of the charitable contribution deduction had been carried over to future tax years.

**[\*53]**                    APPENDIX

## Map contained in Exhibit 97-P



**[\*54]** <u>Exhibit 99-R</u>

